# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-00052-COA

| | |
|---|---|
| **EMERGENCY MEDICINE ASSOCIATES OF JACKSON, PLLC AND JOHN BROOKS, M.D.** | **APPELLANTS/CROSS-APPELLEES** |
| **v.** | |
| **ANITA GLOVER, AS NATURAL MOTHER AND NEXT FRIEND OF HER MINOR SON, TONY GLOVER** | **APPELLEE/CROSS-APPELLANT** |

| | |
|---|---|
| DATE OF JUDGMENT: | 12/20/2012 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | J. COLLINS WOHNER JR. |
| | WALTER T. JOHNSON |
| | JOSEPH GEORGE BALADI |
| | JOHN BURLEY HOWELL III |
| ATTORNEYS FOR APPELLEE: | ROBERT FARLEY WILKINS |
| | BARRY W. HOWARD |
| | DAVID NEIL MCCARTY |
| | BENJAMIN HOUSTON WILSON |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| TRIAL COURT DISPOSITION: | JURY VERDICT AGAINST APPELLANTS/CROSS-APPELLEES FOR $1,500,000 IN ECONOMIC DAMAGES, AND $2,000,000 IN NONECONOMIC DAMAGES, REDUCED TO $500,000 IN ACCORDANCE WITH STATUTORY DAMAGES CAP |
| DISPOSITION: | REVERSED AND REMANDED: 04/26/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1.     Anita Glover filed a medical-malpractice lawsuit on behalf of her son, Anthony

Glover (Tony), for injuries he sustained from the application of a topical prescription drug. A jury returned a verdict finding Dr. John Brooks and Emergency Medicine Associates of Jackson (EMA) seventy-five percent liable and Marty's Pharmacy[1] twenty-five percent liable. The Hinds County Circuit Court reduced the amount of economic damages according to the jury's apportionment of fault and the noneconomic damages according to Mississippi Code Annotated section 11-1-60(b) (Rev. 2014). Dr. Brooks and EMA appeal, and Anita cross-appeals. We find reversible error and remand for further proceedings.

**FACTS**

¶2. In November 2010, Tony complained of a persistent, itchy rash. On November 23, 2010, Anita took Tony to the University of Mississippi Medical Center (UMMC). A UMMC pediatric resident, Dr. Shameka Hudson, evaluated Tony in the emergency room. Dr. Hudson determined that Tony suffered from an allergic reaction, causing a rash and itching. Dr. Benjamin Dillard, Dr. Hudson's attending physician, concurred with Dr. Hudson's assessment. Dr. Hudson prescribed an antihistamine and sent Tony home.

¶3. On December 4, 2010, Tony continued to complain about the rash. Anita took him to the emergency room at Baptist Hospital. Dr. Brooks evaluated Tony. Dr. Brooks was an employee of EMA, and EMA had a contract with Baptist to staff its emergency room.

¶4. Dr. Brooks diagnosed Tony with molluscum contagiosum and dermatitis from Tony's scratching. Molluscum contagiosum is a viral infection of the skin, with small wart-like

---

[1] In the final verdict, only Brooks and EMA remained as defendants in the case. Pharmakeus Inc. (d/b/a Marty's Pharmacy) and its pharmacists were dismissed before trial. The other named defendants in the complaint were dismissed with prejudice prior to trial.

bumps that contain a central dimple. To treat the molluscum contagiosum, Dr. Brooks wrote a prescription for Verr-Canth. Dr. Brooks wrote on the prescription to "apply as directed by [the] pharmacy" and released Tony without further instructions on the medication.

¶5.     Anita attempted to fill the Verr-Canth prescription at a retail pharmacy. She was redirected to Marty's Pharmacy, a specialty compounding pharmacy, because Verr-Canth was not commercially available. Anita took the prescription to Marty's Pharmacy, which also stated it did not carry Verr-Canth. However, Marty's Pharmacy could create or compound a similar medication using a substance called cantharidin.

¶6.     Anna Heindl, a pharmacist at Marty's Pharmacy, received the prescription. Heindl could not read the writing on the prescription, and she called Dr. Brooks to confirm the medication. When Dr. Brooks stated he wrote the prescription for Verr-Canth, Heindl replied she did not know about that particular medication. Dr. Brooks then recommended cantharidin and told Heindl to create a lotion, or solution if a lotion was not available, that contained 0.7% cantharidin. Dr. Brooks did not give any further instructions. Marty's Pharmacy filled the prescription with instructions to "apply as directed" and to repeat in three weeks.

¶7.     On December 6, 2010, Anita applied the medication to Tony's body. Anita used the medication generously and covered large parts of Tony's torso, arms, and feet. Tony went to bed and woke up in the middle of the night with extreme pain and blistering of his skin.

¶8.     Anita took Tony to Baptist again on December 7, 2010. Baptist transferred Tony to UMMC for burn care. At UMMC, Dr. Kim Paduda assessed Tony. Dr. Paduda determined

3

that Tony received burns from the application of the medication. Dr. Paduda completed a thorough physical examination of Tony, but could not find any indications of molluscum contagiosum.

¶9.    After providing initial treatment, Dr. Paduda decided to transfer Tony to a burn unit in Georgia for further care on December 8, 2010. The physicians in Georgia concluded that Tony suffered second degree-burns over sixteen percent of his body due to the use of the medication. Tony was released from the burn center on December 11, 2010.

¶10.    On December 15, 2010, Tony began his follow-up treatment at Crossgates River Oaks Hospital with Dr. William Lineaweaver as his physician. Tony visited Crossgates on December 22, 2010, December 28, 2010, December 30, 2010, January 12, 2011, February 9, 2011, and May 11, 2011. The May 11, 2011 visit was the last time Tony sought medical treatment for the burns.

## PROCEDURAL HISTORY

¶11.    On August 10, 2011, Anita commenced this action by filing a complaint in the First Judicial District of the Hinds County Circuit Court. The complaint asserted a claim for medical malpractice against Dr. Brooks and EMA, among other defendants.

¶12.    A jury trial began on December 10, 2012. The jury returned a verdict against Dr. Brooks and EMA. The jury awarded noneconomic damages of $2,000,000 and economic damages of $1,500,000. The jury also assigned seventy-five percent of the negligence to Dr. Brooks and EMA, and the jury assigned twenty-five percent to Marty's Pharmacy. The trial court entered a final judgment on December 20, 2012. In the judgment, the trial court

4

reduced the damages by twenty-five percent to reflect this fault allocation to Marty's Pharmacy and awarded $1,125,000 in economic and $1,500,000 in noneconomic damages.

¶13. Dr. Brooks filed a posttrial motion that included requests for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. The motion also asked that the judgment be modified based on the application of the noneconomic-damages cap codified in Mississippi Code Annotated section 11-1-60(b). Anita argued the cap was unconstitutional and should not apply. Dr. Brooks and the Attorney General's Office, as an intervenor, argued in favor of the constitutionality of the statute.

¶14. On January 28, 2013, the trial court held a hearing on the motions. On September 6, 2013, without deciding on the constitutional question of the caps, the trial court entered a final judgment that granted the motion for a remittitur of the noneconomic damages, enforced the statutory cap of $500,000, and denied the other posttrial motions.

¶15. It is from this judgment that Dr. Brooks and EMA appeal. They raise six issues:

I.      Whether [Dr. Brooks and EMA] were unfairly prejudiced by the refusal to require an independent medical exam, which was necessary to determine [Tony's] true point of maximum medical improvement;

II.     Whether [Dr. Brooks and EMA] were unfairly prejudiced by unreliable, inadmissible evidence of allegedly permanent physical impairment and disability based upon the testimony of a former treating physician, Dr. Lineaweaver, who admitted not having followed [Tony] to the point of maximum medical improvement;

III.    Whether the $1.5 million economic-damages award is supported by sufficient evidence or is against the overwhelming weight of the evidence;

IV.     Whether [Tony's] permanent physical impairment and disability and future-lost-wages claims should be reversed and rendered due to the

complete failure of proof in support of the claims;

V.  Whether [Dr. Brooks and EMA] were improperly denied a superseding-cause instruction; and

VI.  In the alternative, whether noneconomic damages must be reduced in proportion to fault.

Anita has cross-appealed. She raises one issue:

I.  The mandatory cap of $500,000 to noneconomic damages in medical-malpractice cases violates the Mississippi Constitution.

**ANALYSIS**

¶16.  A majority of this Court finds that the first issue raised by Dr. Brooks and EMA is dispositive. However, we also address other issues. Further, the majority, having determined that there is reversible error and this case should be remanded, has also determined that Anita's cross-appeal is moot.

> *I.  The trial court erred in failing to grant Dr. Brooks and EMA's motion for an independent medical exam.*

¶17.  A majority of the Court finds that the trial court committed reversible error when it denied the motion for an independent medical examination filed by Dr. Brooks and EMA. The majority has also determined that the proper disposition is to remand for a new trial and instruct the trial court to allow an independent medical examination.

¶18.  We begin with the proper standard of review. In *Eaton Corp. v. Frisby*, 133 So. 3d 735, 747 (¶45) (Miss. 2013), the court held:

> Trial courts have considerable discretion in discovery matters and decisions will not be overturned unless there is an abuse of discretion. In reviewing a decision that is within the trial court's discretion, we first ask if the trial court applied the correct legal standard. We will affirm the trial court's decision

unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors.

(Internal citations and quotation marks omitted).

¶19.    This issue considers Rule 35 of the Mississippi Rules of Civil Procedure, "Physical and Mental Examinations of Persons."  It is also referred to as an independent medical examination (IME).

¶20.    Rule 35 was adopted effective January 16, 2003.  M.R.C.P. 35 Advisory Committee Historical Note.  Unlike other discovery mechanisms of the Rules (M.R.C.P. 26 through 34), Rule 35 is not allowed as a matter of right upon the request of a party.  Instead, "Rule 35 was adopted to allow a court to order a physical or mental examination of a person for good cause on motion."    M.R.C.P. 35 Advisory Committee Historical Note.

¶21.    Rule 35(a) provides:

> When the . . . physical condition . . . of a party or of a person in the custody or under the legal control of a party is in controversy, the court in which the action is pending may order the party to submit to a physical . . . examination by a suitably licensed or certified examiner or to produce for examination the person in the party's custody or legal control.  The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

The Comment[2] provided:

> Rule 35(a)(1) is modeled, in general, after Fed. R. Civ. P. 35.  The purpose of Rule 35(a)(1) is to allow a court to order a physical or mental examination of a person for good cause on motion.  Previously, the omission in the Mississippi

_____

[2] On June 9, 2014, the Mississippi Supreme Court entered an order that repealed the Comments to the Mississippi Rules of Civil Procedure and replaced them with Advisory Committee Notes.  There is no Advisory Committee Note for Rule 35.

Rules of Civil Procedure of a counterpart to Federal Rule 35 was held to preclude a court from ordering an examination under any circumstances. *See Swan v. I. P. Inc.*, 613 So. 2d 846 (Miss. 1993).

The order may be made only upon good cause and is limited to cases in which the condition of the party or person to be examined is in controversy. For a discussion of the showing required, *see* Wright & Miller, *Federal Practice and Procedure, Civil*, § 2234.1 (1994). Although some states allow examinations under Rule 35 without an order of the court, Mississippi Rule 35, like the federal counterpart, requires such an order, and, generally, the choice of physicians is left to the party seeking the examination. Addressing federal practice, Wright [and] Miller have said: "The usual attitude is that the moving party has no absolute right to the choice of the physician, but that when no serious objection arises, it is probably best for the court to appoint the doctor of the moving party's choice." Wright & Miller, *Federal Practice and Procedure, Civil*, § 2234.2 (1994).

¶22.    The practical application of this rule is most often in a personal-injury action where the plaintiff asks for damages due to his injury. The plaintiff would not need to use Rule 35 to get an examination, so the only realistic use of this rule is for a defendant to compel the plaintiff to appear for a physical examination. In this sense, it appears that this case is a prime example of the proper use of Rule 35 to permit the opposing side to examine the plaintiff. If good cause did not exist in this case, we do not see where good cause would ever exist.

¶23.    There is one Mississippi Supreme Court decision that provides us guidance. In *Baker Donelson Bearman Caldwell & Berkowitz P.C. v. Seay*, 42 So. 3d 474, 477 (¶2) (Miss. 2010), a former client brought a lawsuit against his friend and former lawyer for negligent infliction of emotional distress and breach of fiduciary duty, among other claims. The supreme court considered an interlocutory appeal and focused on the trial court's decision on motions for summary judgment and partial summary judgment. However, the supreme court also

8

considered whether the trial court erred when it denied the motion to compel the plaintiff, Sam Seay, submit to an IME under Rule 35. The court concluded:

> The circuit court's "Order Denying Defendants' Motion to Compel Physical and Mental Examination of Plaintiff" found an absence of "good cause" and that "defendants offered no evidence that the depositions of Sam and his treating physician and the production of Sam's medical records are inadequate or insufficient to show Sam's physical and mental status."
>
> Mississippi Rule of Civil Procedure 35(a) provides, in pertinent part, that:
>
> > [W]hen the mental or physical condition . . . of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner . . . . The order may be made only on motion for good cause shown . . . .
>
> M.R.C.P. 35(a) (emphasis added). Given the dearth of Mississippi caselaw on Rule 35, rendering this an issue of first impression for this Court, along with the limited nature of the record with respect to this issue (i.e., only the motion and subsequent order), this Court concludes that the circuit court did not abuse its discretion in denying [the defendants'] Motion to Compel Physical and Mental Examination.

*Baker Donelson*, 42 So. 3d at 495 (¶¶63-64). This case offers little guidance.

¶24. In *Schlagenhauf v. Holder*, 379 U.S. 104, 118-19 (1964), the United States Supreme Court addressed the "in controversy" and "good cause" requirements of Federal Rule of Civil Procedure 35, the counterpart to Mississippi's Rule 35. The court held that these requirements:

> [A]re not met by mere conclusory allegations of the pleadings – nor by mere relevance to the case – but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination. Obviously, what may be good cause for one type of examination may not be so for another. The ability of the movant to obtain the desired information by other means is also relevant.

9

*Schlagenhauf*, 379 U.S. at 118.

### A. The "In Controversy" Requirement

¶25. Here, Dr. Brooks and EMA contend that Anita placed Tony's physical condition in controversy within the meaning of Rule 35 when she filed the complaint for medical malpractice.

¶26. "[T]he plaintiff can place his or her mental or physical condition in controversy through representations made during the course of litigation. . . . 'A plaintiff in a negligence action who asserts mental or physical injury . . . places that mental or physical injury clearly in controversy[.]'" *Ornelas v. S. Tire Mart LLC*, 292 F.R.D. 388, 391 (S.D. Tex. 2013) (citing *Schlagenhauf*, 379 U.S. at 119). Thus, a claim based on a physical condition meets the "in controversy" requirement.

¶27. Here, Anita's claim alleged that Dr. Brooks and EMA committed medical malpractice in the negligent treatment of Tony. The complaint sought damages based on Tony's accrued medical bills, permanent scarring, and permanent environmental disabilities caused by the application of the cantharidin medication. The complaint is sufficient to find that Dr. Brooks and EMA have met the "in controversy" requirement.

### B. The "Good Cause" Requirement

¶28. When the trial judge entered the order that denied the motion for an IME, on November 30, 2013, the order explained that the trial court found that "there has been no showing of good cause for an [IME]." At the hearing on December 10, 2013, when the judge considered the renewed motion for an IME, the trial judge gave no reason for the denial. We

10

are left to consider whether the trial judge committed reversible error in this decision without the benefit of the trial judge's reasoning or an explanation.

¶29.    In *Schlagenhauf*, the supreme court ruled:

> Of course, there are situations where the pleadings alone are sufficient to meet these requirements. A plaintiff in a negligence action who asserts mental or physical injury . . . places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury.[3]

*Schlagenhauf*, 379 U.S. at 119. Dr. Brooks and EMA rely on this principle when they claim that the complaint placed Tony's physical condition and permanent disability in controversy and was sufficient to establish good cause for the IME.

¶30.    Anita disputes this argument. She claims that the denial of the motion was not an abuse of discretion. Anita also contends that there was simply no "good cause" to order any further medical examination. She asserts that the only alleged issue in controversy was just how deeply affected Tony was after the burns. Tony's testimony was that the burns had impacted how long he could stay in the sun, that he was sensitive to how hot or cold water was in the shower, and that he wore long clothing when he went outside to shield himself from the sun. She claims that this testimony, Dr. Lineweaver's deposition testimony, and medical records were enough.

---

[3] It is important to note that, in *Schlagenhauf*, the court was considering a motion for an IME filed by one of several defendants in a personal-injury action that requested an IME of one of the codefendants. The district court ordered the petitioner to submit to several physical and mental examinations. The supreme court remanded the case based on the determination that the petitioner had not "affirmatively put into issue his own mental or physical condition"; his mere involvement in the accident was insufficient to warrant an automatic order for examination. *Schlagenhauf*, 379 U.S. at 121.

11

¶31. The United States Supreme Court was clear in the conclusion that "a plaintiff in a negligence action who asserts mental or physical injury . . . provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury." *Schlagenhauf*, 379 U.S. at 119. The Mississippi Supreme Court's decision in *Baker Donelson* did not resolve this question differently. Instead, the supreme court's holding was qualified by "the limited nature of the record with respect to this issue (i.e., only the motion and subsequent order)." *Baker Donelson*, 42 So. 3d at 495 (¶64). Here the record is not limited. When we examine the chronology of events and the procedural history, we find that there was an overwhelming reason to find good cause to allow an IME.

¶32. Tony was burned when the cantharidin was applied on December 6, 2010. He was admitted to the hospital the next day and treated at UMMC and the burn center through December 11, 2010.

¶33. Dr. Lineaweaver evaluated Tony for the first time on December 15, and had follow-up visits on December 22, 28, and 30, 2010. Dr. Lineaweaver last examined Tony on January 12, 2011, and Tony was released for physical activity with no impairment on January 17, 2011. Tony had follow-up visits with nurse practitioners on February 9 and May 11, 2011. Tony did not see a medical professional after May 11.

¶34. The complaint was filed on August 10, 2011. Responsive pleadings were filed and discovery commenced. Anita responded to Dr. Brooks and EMA's discovery requests on November 7, 2011.

¶35. Dr. Brooks and EMA filed their first motion for an IME on March 26, 2012. Anita

12

filed her response to the motion on April 9, 2012. Dr. Brooks and EMA filed a rebuttal memorandum on April 17, 2012. A hearing was held on April 19, 2012. The trial court did not immediately rule on the motion and took it under advisement.[4]

¶36. On July 16, 2012, Anita designated her expert and fact witnesses. Her designations included Dr. Lineaweaver's report of April 9, 2012, a life-care plan dated May 13, 2011, a vocational-rehabilitation evaluation created by Bruce Brawner on July 15, 2012, and an economic-loss analysis created by Dr. Glenda Glover on June 13, 2012.

¶37. Dr. Brooks and EMA issued notices of depositions for Anita's experts on August 15, 2012. They filed a motion to compel the expert depositions on August 17. On August 27, Anita filed her response, and a hearing was held on the motion to compel. On September 7, Dr. Brooks and EMA sent a letter to the trial court regarding their motion to compel. On November 6, the trial court granted Dr. Brooks and EMA's request to depose Anita's experts.

¶38. On November 9, 2012, Dr. Brooks and EMA submitted a letter to the trial court that requested a ruling on the IME motion and attached a proposed order granting the motion. On November 30, the trial court denied the motion for an IME.

¶39. On December 3, 2012, Dr. Brooks and EMA deposed Dr. Lineaweaver. On December 6, Dr. Brooks and EMA submitted a renewed motion for an IME based on Dr. Lineaweaver's admissions in his deposition.

¶40. Then, on December 10, 2012, the trial court held a hearing on the renewed motion for

---

[4] Normally, a motion for an IME under the Mississippi Rules of Civil Procedure should be ruled upon by the trial court promptly, at the hearing or shortly thereafter. There is nothing in the record that explains the trial court's decision to take this matter under advisement and then to allow an extended delay on ruling on an important discovery matter.

an IME, denied the motion, and commenced the trial.

¶41. From this chronology and procedural history, we can determine that Dr. Brooks and EMA only had access to Tony's medical records on his treatment that occurred in a span of approximately six months. He was burned on December 6, 2010, and his medical treatment by Dr. Lineaweaver ended on January 12, 2011. His last treatment by any medical professional was on May 11, 2011. Thus, the medical records produced only related to Tony's treatment from December 4, 2010 (when Dr. Brooks prescribed the medication) to May 11, 2011.

¶42. However, the complaint asked for damages for Tony's permanent injury. When the first motion for an IME was filed, on March 26, 2012, Dr. Brooks and EMA had received some discovery, including Anita and Tony's depositions. Yet Anita's designation of expert witnesses was disclosed on July 16, 2012, and included a report from Dr. Lineaweaver that he generated on April 9, 2012. In his report, Dr. Lineaweaver opined that Tony continued to heal six to twelve months after the initial injury, likely suffered from permanent sensitivities to the sun and temperatures, and needed continued dermatological care.

¶43. The trial court denied the motion for an IME on November 30, 2012, after finding that Dr. Brooks and EMA failed to show good cause.

¶44. Dr. Lineaweaver's deposition was taken on December 3, 2012. This deposition revealed additional information that supported the motion for an IME. In his deposition, *Dr. Lineaweaver admitted he did not know Tony's last point of healing*. The following exchange occurred:

14

Q: You last saw [Tony], you testified, on May 11, 2011.

A: Yes.

Q: Approximately six months after –

A: What was his date of injury?

Q: December of 2010.

A: Yes. Six months.

Q: And so you wouldn't dispute that you don't know his final point of healing[?]

A: *That's true. I know nothing past that six-month period.*

Q: And he did continue to heal past that six months, didn't he?

A: *I would have to see him to determine that.*

Q: Generally, patients do in his conditions, though, don't they?

A: There can be progress certainly *up to a year, sometimes longer.*

Q: And you actually did not see him after January 12, 2011, correct?

A: Exactly. As I recall, the last two notes were my mid-levels on protocol that I reviewed, but I did not see him.

Q: *To render an opinion, the opinions you rendered in this case, wouldn't you really need to see him again?*

A: *If there was anything I said that would be contested, yes.*

Q: Well, we contest almost everything you said. Wouldn't you need to see him again?

A: I could resolve a contested point that I've raised *by seeing him again or seeing – correctly taken photographs would at least be a reasonable way to render an opinion.*

(Emphasis added). In addition, Dr. Lineaweaver had testified that he was not familiar with cantharidin.

¶45. Dr. Lineaweaver's deposition testimony clearly supports both the original motion for an IME and the renewed motion for an IME. Dr. Lineaweaver's April 9, 2012 report indicated that he expected Tony to continue to heal up to one year and maybe longer. The deposition testimony revealed that Dr. Lineaweaver lacked sufficient medical knowledge to determine Tony's healing after six months, and he admitted the he needed to reexamine Tony in order to render a reasonable opinion. In fact, there was no medical professional who could testify as a fact or expert witness as to Tony's medical condition and permanent injury at the point when Dr. Lineaweaver had opined that he would continue to heal.

¶46. Dr. Lineaweaver also admitted that he did not know whether Tony suffered from temperature sensitivity and only concluded Tony needed to avoid sun exposure based on photographs. Yet, in his deposition, Dr. Lineaweaver stated he could render an opinion upon seeing "correctly taken photographs," which he did not have. These were the reasons that Dr. Brooks and EMA filed for a renewed motion for an IME on December 6, 2012.

¶47. On December 10, 2012, the day trial began, the trial court conducted a hearing on the renewed motion. Dr. Brooks and EMA raised these arguments at the hearing. The trial court then found Dr. Brooks and EMA failed to show good cause for the IME without giving an explanation and commenced trial.

¶48. When we review the trial court's decisions to deny the motions for an IME, we look at its conclusion that Dr. Brooks and EMA failed to show good cause. When we consider

16

the appropriate standard of review, we find that there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon the weighing of relevant factors. This finding requires that we find reversible error.

¶49. Dr. Lineaweaver, Dr. Brooks, and EMA had the same information that Anita contended was sufficient to show Tony's injuries. Yet Dr. Lineaweaver admitted he could not form an opinion as to Tony's permanent impairment without further examination. The information about Tony's permanent impairment was crucial to the defense. Dr. Brooks and EMA strongly disputed that Tony's injuries from the application of the cantharidin resulted in the permanent impairments asserted. As such, good cause was clearly demonstrated for an IME when Dr. Brooks and EMA showed the IME would reveal "specific facts relevant to the cause of action" that were necessary to their defense of the case. *Ornelas*, 292 F.R.D. at 391 (citation omitted).

¶50. Nevertheless, some courts have held that "[e]ven when the 'good cause' and 'in controversy' requirements are met, it is still in the sound discretion of the trial court whether to order the examination." *Hardy v. Riser*, 309 F. Supp. 1234, 1241 (N.D. Miss. 1970). The purpose of the rule, however, is not served by this interpretation. Other courts have interpreted the purpose of Rule 35 "as a forthright attempt to provide a 'level playing field' between the parties in their respective efforts to appraise the Plaintiff's physical state." *Stewart v. Burlington N. R.R.*, 162 F.R.D. 349, 351 (D. Minn. 1995) (citation omitted).

¶51. Dr. Brooks and EMA contended that Tony's permanent impairment was not as extensive as Anita alleged. To adequately defend his position, Dr. Brooks and EMA needed

access to conclusive information about Tony's permanent impairment. Dr. Brooks and EMA could have obtained this information through an IME and, to deny Dr. Brooks and EMA this opportunity to evaluate Tony's permanent condition, severely prejudiced their defense. Therefore, Dr. Brooks and EMA demonstrated good cause for an IME, and the trial court abused its discretion when it denied the motions.

### C.    The Specific Form Requirements of the Motion

¶52.    In addition to the "in controversy" and "good cause" requirements, Rule 35 also necessitates a motion for an IME include the specifics of "time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made." Anita claims Dr. Brooks and EMA failed to proffer these specifics as required by Rule 35.

¶53.    In both the initial and renewed motions for an IME, Dr. Brooks and EMA stated that the time and place would be agreed upon by the parties, the defense would choose a certified dermatologist, and the scope of the examination would relate to Tony's alleged injuries. The renewed motion for an IME also detailed that the examination would include noninvasive examinations and digital imaging.

¶54.    While both motions seem to fall short of the requirements, courts have granted IME motions that did not comport with the specifics of the rule. *See Ragge v. MCA/Universal Studios*, 165 F.R.D. 605, 610 (C.D. Cal. 1995) (granted motion for IME when time and date of exam not specified); *Galieti v. State Farm Mut. Auto. Ins.*, 154 F.R.D. 262, 263 (D. Colo. 1994) (granted IME motion even when motion failed to state specific time, place, or substantive reasons for motion). Also, the Comment to Rule 35 provided:

> Although some states allow examinations under Rule 35 without an order of the court, Mississippi Rule 35, like the federal counterpart, requires such an order, and, generally, the choice of physicians is left to the party seeking the examination. Addressing federal practice, Wright [and] Miller have said: "The usual attitude is that the moving party has no absolute right to the choice of the physician, but that when no serious objection arises, it is probably best for the court to appoint the doctor of the moving party's choice." Wright & Miller, *Federal Practice and Procedure, Civil*, § 2234.2 (1994).

Therefore, strict adherence to the rule's form requirements does not appear to completely preclude the motion.

¶55.    In both *Ragge* and *Galieti*, the courts granted the imperfect IME motions due to the close proximity of the motions to the trial dates. *Id.* Admittedly, this case differs from *Ragge* and *Galieti* in that the courts in those cases granted the respective IME motions. We determine, however, that Dr. Brooks and EMA's motion met the "in controversy" and "good cause" requirements. As such, the trial court should have granted the motion. Therefore, the same rationale applies here.

¶56.    While Dr. Brooks and EMA originally filed his IME motion on March 26, 2012, the trial court did not rule on the motion until November 30, 2012, approximately ten days prior to the trial date. Further, the trial court did not rule on the renewed motion until the first day of the trial on December 10, 2012. While compliance with the specific form requirements of Rule 35 is strongly encouraged, in this limited case, where the ruling on both motions and the trial date occurred within days of each other, the imperfections of the motion do not invalidate it.

¶57.    We also note that the proximity of the rulings on the motions and the renewed motion to the trial date was not caused by Dr. Brooks and EMA. Dr. Brooks and EMA initially filed

19

the motion for an IME on March 26, 2012, but the trial court failed to rule on the motion until November 30, 2012. Further, the renewed motion, based on admissions in Dr. Lineaweaver's deposition on December 3, came on December 6, 2012. The delay obtaining Dr. Lineaweaver's deposition is also not attributable to Dr. Brooks or EMA. They first attempted to depose Dr. Lineaweaver on September 26, 2012, through a notice on August 15, 2012. Anita opposed Dr. Brooks and EMA's attempt to depose Dr. Lineaweaver. Dr. Brooks and EMA submitted a motion to compel for rulings on both the deposition of Dr. Lineaweaver and the IME on August 18, 2012. The trial court did not grant Dr. Brooks and EMA's request to depose Dr. Lineaweaver until November 6, 2012, however. Therefore, Dr. Brooks and EMA could not avoid the proximity to the trial date.

¶58. For these reasons, we find the trial court abused its discretion in denying Dr. Brooks and EMA's motion and renewed motion for an IME to determine the extent of Tony's permanent physical impairment. Therefore, we reverse and remand for a new trial. We also instruct the trial judge to enter an order that allows an IME.

> II. *The trial court erroneously admitted Dr. Lineaweaver's expert testimony on Tony's permanent physical impairment.*

¶59. Dr. Brooks and EMA also contend that the trial court should not have admitted Dr. Lineaweaver's unreliable expert testimony about Tony's permanent injury when he did not evaluate Tony after January 12, 2011. Conversely, Anita argues that Dr. Lineaweaver qualified as a burn expert and gave his opinion based on his observations of Tony's condition.

¶60. "When reviewing a trial court's decision to allow or disallow evidence, including

20

expert testimony, we apply an abuse of discretion standard." *Watts v. Radiator Specialty Co.*, 990 So. 2d 143, 145-46 (¶7) (Miss. 2008) (quoting *Canadian Nat'l/Ill. Cent. R.R. v. Hall*, 953 So. 2d 1084, 1094 (¶29) (Miss. 2007)). "Unless this Court concludes that a trial court's decision to admit or exclude evidence was arbitrary and clearly erroneous, that decision will stand." *Id.* (citation omitted).

¶61. Mississippi Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) *the witness has applied the principles and methods reliably to the facts of the case*.

(Emphasis added). Dr. Brooks and EMA primarily contest the reliability of Dr. Lineaweaver's testimony as to Tony's permanent injury and disability.

¶62. To decide the admissibility of expert testimony,

> [t]he trial court must engage in a two-pronged inquiry, determining whether the expert testimony rests on a reliable foundation and is relevant to the matter. Regarding the "reliability" prong – which is at issue in the present case – the testimony must be grounded in the methods and procedures of science, not merely a subjective belief or unsupported speculation.

*Worthy v. McNair*, 37 So. 3d 609, 615 (¶16) (Miss. 2010) (internal citation and citation omitted).

¶63. Dr. Lineaweaver examined Tony on January 12, 2011, and reviewed his medical records through May 11, 2011. At trial, however, Dr. Lineaweaver testified, through his deposition, that he did not examine Tony after this date, did not have experience with

21

cantharidin burns, and needed to examine Tony at his final point of healing in order to have a fully formed opinion of Tony's permanent physical impairment.

¶64.    Dr. Brooks and EMA contend that Dr. Lineaweaver did not examine Tony at his final point of healing, which rendered his opinion unreliable. But Dr. Lineaweaver did not have to evaluate Tony in order to opine on his condition. The supreme court has "held that the fact that the expert witness did not examine the plaintiff goes to the weight to be given the physician's testimony, not its admissibility." *McCaffrey v. Puckett*, 784 So. 2d 197, 203 (¶19) (Miss. 2001) (citation omitted). Regardless, Dr. Lineaweaver admitted that he could not give a reliable assessment of Tony's condition after the six-month period of healing.

¶65.    Dr. Lineaweaver opined that Tony suffered from permanent scarring and environmental sensitivity, but also testified that Tony would continue to heal for up to a year after the incident based on his experience treating burn victims. Dr. Lineaweaver's testimony regarding Tony's healing point after the six-month point after the incident was speculation. The Mississippi Supreme Court addressed a similar occurrence in *Bullock v. Lott*, 964 So. 2d 1119, 1129 (¶35) (Miss. 2007).

¶66.    In *Bullock*, the supreme court found an expert witness properly qualified, but that the trial court abused its discretion in allowing the expert to testify to conclusions not supported by sufficient facts or data. *Id.* Like here, the expert in *Bullock* testified to hypothetical conditions. *Id.* While testimony showed that Tony experienced some permanent scarring and sensitivity, there was no indication in the medical records or Dr. Lineaweaver's examinations to support his conclusions on Tony's permanent impairment.

¶67. Dr. Lineaweaver was correctly admitted as an expert witness. However, Dr. Lineaweaver could not testify to the extent of Tony's permanent injuries when he neither examined Tony after January 12, 2011, nor reviewed any medical records past May 11, 2011, when he explicitly noted that Tony could continue to heal up to one year after the incident. Therefore, the trial court abused its discretion when it admitted Dr. Lineaweaver's unreliable testimony about Tony's permanent injury and disability.

III.    *The evidence did not support a jury verdict of $1,500,000 in economic damages.*

¶68. As a third contention, Dr. Brooks and EMA argue the evidence presented at trial did not support the jury's verdict of $1,500,000 in economic damages. Namely, the evidence only proved $112,499 in actual medical expenses. Anita counters that the credible evidence supported the jury verdict.

¶69. "It is primarily the province of the jury to determine the amount of damages to be awarded, and the award will normally not be 'set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount, and outrageous.'" *Miss. Baptist Health Sys. Inc. v. Kelly*, 88 So. 3d 769, 778 (¶31) (Miss. Ct. App. 2011) (quoting *Estate of Jones v. Phillips ex rel. Phillips*, 992 So. 2d 1131, 1150 (¶50) (Miss. 2008)). "However, this Court may order a new trial if we find the damages are 'excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence.'" *Id.* (quoting Miss. Code Ann. § 11-1-55 (Rev. 2014)).

¶70. "It is absolutely incumbent upon the party seeking to prove damages to offer into

23

evidence the best evidence available on each and every item of damage." *Strickland v. Rossini*, 589 So. 2d 1268, 1274-75 (Miss. 1991) (quoting *Eastland v. Gregory*, 530 So. 2d 172, 174 (Miss. 1988)). "[D]amages may only be recovered when the evidence presented at trial 'removes their quantum from the realm of speculation and conjecture and transports it through the twilight zone and into the daylight of reasonable certainty.'" *Frierson v. Delta Outdoor Inc.*, 794 So. 2d 220, 225 (¶14) (Miss. 2001) (quoting *Wall v. Swilley*, 562 So. 2d 1252, 1256 (Miss. 1990)).

¶71. Dr. Glenda Glover testified at trial to Tony's prospective earnings based on his permanent injury. Dr. Glover conducted an economic analysis that estimated a lifetime loss of between $1,040,828 and $2,521,902 in wages. At trial, however, Dr. Glover testified that she estimated Tony would suffer future lost wages of approximately $707,686. Further, Dr. Glover based this estimation upon the jobs analysis performed by Bruce Brawner.

¶72. Brawner testified to Tony's loss of job prospects due to his permanent impairment. Brawner made this conclusion based on Dr. Lineaweaver's testimony on Tony's permanent impairment. Yet, as previously stated, Dr. Lineaweaver's testimony on Tony's permanent impairment was unreliable. As such, Brawner's and, consequently, Dr. Glover's testimonies and conclusions were based on unsupported facts. Therefore, the evidence did not support the conclusion that Tony suffered $707,686 in lost future wages.

¶73. Regardless of the unreliability of the evidence, Anita did not present evidence to support an economic-damages award of $1,500,000. Anita proved $112,499 in medical expenses, which Dr. Brooks and EMA do not dispute, but failed to prove any other economic

damages. Therefore, the sufficient evidence supports an award of $112,499 in economic damages. Thus, we find this to be reversible error. However, since this case has been reversed and remanded for a new trial, we understand that this issue will be considered on remand.

IV.    *The trial court improperly denied a superseding-cause instruction.*

¶74.    Dr. Brooks and EMA further contend that the trial court committed reversible error by improperly denying his request for a jury instruction on superseding cause. Dr. Brooks and EMA argue that Marty's Pharmacy's failure to properly label the medication and to give adequate directions to Anita constituted an independent, superseding cause requiring an additional instruction. Anita counters that the jury instructions defining proximate cause sufficiently accounted for any negligence by Marty's Pharmacy.

¶75.    "It is well-established law that a defendant is entitled to have the jury instructed on his theory of the case." *Eckman v. Moore*, 876 So. 2d 975, 979 (¶11) (Miss. 2004) (citing *Coho Resources Inc. v. McCarthy*, 829 So. 2d 1, 23 (¶69) (Miss. 2002)). "However, a court may refuse a jury instruction which 'incorrectly states the law, is fairly covered elsewhere in the instructions, or is without foundation in the evidence.'" *Id.* at 979-80 (¶11). "This Court will not reverse the verdict of the jury if that jury was fully and fairly instructed by the other instructions." *Id.* at 980 (¶11).

¶76.    "The question of whether an act of negligence is a foreseeable superseding cause requires an examination of the sequence of events leading to the injury." *Lift-All Co. v. Warner*, 943 So. 2d 12, 17 (¶18) (Miss. 2006) (citation omitted).

25

The Restatement sets out six factors to consider in determining whether a particular intervening force can be fairly classed as a superseding cause:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; [and]

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Southland Mgmt. Co. v. Brown ex rel. Brown*, 730 So. 2d 43, 46 (Miss. 1998) (citing Restatement (Second) of Torts § 440 (1965)).

¶77. Dr. Brooks and EMA argue that Dr. Brooks wrote the prescription to include instructions for use as directed by the pharmacy. Marty's Pharmacy and Heindl failed to include any specific instructions on the actual prescription bottle other than use as directed and to repeat in three weeks. Heindl testified that pharmacists do not ordinarily create the instructions included on prescriptions, but also admitted she did not clarify the instructions with Dr. Brooks. This admission, coupled with Marty's Pharmacy's alteration of the original directions, created an independent, superseding cause, according to Dr. Brooks and EMA.

26

¶78.    Further, at trial, Dr. Michael Todaro, a pharmacy expert, testified to the following:

Q:    Who's job is it to put down the clear directions?

A:    Before the drug leaves the hands of the pharmacist[,] it's the pharmacist's responsibility to make sure that [the instructions are] clear, and it's also the pharmacist's responsibility to counsel the patients to make sure the patient understands what drug they are receiving and how to use the drug correctly.

. . . .

Q:    If a pharmacist is unclear as to a prescription, what is required of him?

A:    If the pharmacist is unclear of a prescription, the pharmacist should clarify with the prescriber, with the physician.  So we should call the physician.  We should have any information that is unclear to the pharmac[ist] before we process the prescription and give it to the patient.

Dr. Todaro also testified:

Q:    And did the failure of the pharmacy to comply with the pharmacy regulations[–]is it your opinion that[,] taking action as a pharmacy as a whole[,] that they failed to comply with the pharmacy regulations?

A:    Yes.

Q:    And did the pharmacy's failures in those respects in this case *solely cause* Anthony Glover's adverse event?

A:    *Yes.*  A pharmacist was the last person to touch this prescription.  They should have been the one[s] to make sure that it was going to be dispensed correctly *or else this wouldn't have happened.*

(Emphasis added).  Thus, Dr. Todaro's testimony clearly established a jury question as to whether Marty's Pharmacy created a situation necessitating a superseding-cause instruction.

¶79.    Dr. Brooks and EMA do not necessarily contest Dr. Brooks's negligence.  They do, however, argue that Marty's Pharmacy's actions at least entitled them to a superseding-cause

27

instruction.

> Although one may be negligent, . . . if another, acting independently and voluntarily, puts in motion another and intervening cause which efficiently thence leads in unbroken sequence to the injury, the latter is the proximate cause and the original negligence is relegated to the position of a remote and, therefore, a non-actionable cause.

*Eckman*, 876 So. 2d at 982 (¶18) (quoting *Miss. City Lines v. Bullock*, 194 Miss. 630, 639, 13 So. 2d 34, 36 (1943)). *Eckman* is instructive.

¶80. In *Eckman*, the supreme court found that the defendant doctor was entitled to a superseding-cause instruction when the evidence at trial illustrated the nursing staff possibly contributed as an independent cause for the decedent's death. *Id.* at (¶19). Like here, the trial court in *Eckman* gave proximate-cause instructions in order to account for any negligence of the nursing staff. *Id.* at 981 (¶15). The supreme court, however, held that "[t]he jury must be instructed on all material issues presented in evidence" and the proximate-cause instructions failed to address the doctor's arguments. *Id.* at 982 (¶19).

¶81. Therefore, just as the supreme court concluded in *Eckman*, the proximate-cause instructions did not sufficiently present Dr. Brooks and EMA's superseding-cause argument. As such, the trial court erroneously denied Dr. Brooks and EMA's request for a superseding-cause instruction.

¶82. The trial court erroneously denied Dr. Brooks and EMA's requests for an IME and a superseding-cause instruction. Further, the trial court erred in admitting Dr. Lineaweaver's unreliable testimony, and the evidence did not support an award of $1,500,000 in economic damages. For these reasons, we reverse and remand this case for a new trial. Having found

that reversal is appropriate, we do not consider the issues raised in the cross-appeal.

¶83. **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT, IS REVERSED, AND THIS CASE IS REMANDED FOR A NEW TRIAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE/CROSS-APPELLANT.**

**ISHEE, WILSON AND GREENLEE, JJ., CONCUR. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J. BARNES, CARLTON, FAIR AND JAMES, JJ., NOT PARTICIPATING.**

**IRVING, P.J., DISSENTING:**

¶84. I respectfully dissent, as I find no reversible error in the issues raised on appeal.

*I.      Denial of Motion for an IME*

¶85. The majority finds the trial court erred in denying Dr. Brooks and EMA's motion and renewed motion for an IME. In doing so, the majority, in essence, holds that a request for an IME should never be denied in a case where the plaintiff has asserted a physical or mental injury. However, this is contrary to the good-cause requirement set out in Mississippi Rule of Civil Procedure 35 and takes away any discretion of the trial judge.

¶86. Rule 35(a) states that when the mental or physical condition of a party is in controversy, the trial court "may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner[.]" However, "[t]he order may be made only on motion for good cause shown[.]" *Id.* The requirements of Rule 35 "are not met by mere conclusory allegations of the pleadings—nor by mere relevance to the case—but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964).

29

It is within the trial court's discretion whether to grant or deny a motion for an IME. *Baker Donelson Bearman Caldwell & Berkowitz P.C. v. Seay*, 42 So. 3d 474, 495 (¶64) (Miss. 2010). Our review is limited to determining whether the trial court abused its discretion in granting or denying the motion. *Id.*

¶87. I agree with the majority that Tony's physical condition was "in controversy," since "[a] plaintiff in a negligence action who asserts [a] mental or physical injury . . . places that mental or physical injury clearly in controversy[.]" *Schlagenhauf*, 379 U.S. at 119. However, I find that the trial court did not abuse its discretion in finding that Dr. Brooks and EMA failed to show good cause for the IME. Further, Dr. Brooks and EMA's motion undisputedly did not comply with Rule 35(a) in that it failed to state "the time, place, manner, conditions, and scope of the examination" or "the person or person by whom" the examination was to be made.

### A. Failure to Show Good Cause

¶88. Dr. Brooks and EMA argue, and the majority agrees, that good cause was shown for an IME because the record lacked proof of when Tony reached maximum medical improvement. Dr. Brooks and EMA assert that because Dr. Lineaweaver did not treat Tony after January 12, 2011, and lacked experience with cantharidin, he could not assess Tony's permanent or long-term injuries.

¶89. Although he was deposed by the Glovers, Dr. Lineaweaver was Tony's treating physician and independently examined him prior to trial. Dr. Lineaweaver testified at trial by way of a videotaped deposition. Dr. Lineaweaver is an expert in burn injuries, the head

30

of Mississippi's only burn center, and a board-certified plastic surgeon with nearly forty years' experience. He testified that Tony's exposure to cantharidin resulted in "partial thickness," or second-degree burns. These burns penetrated through Tony's skin and covered sixteen percent of his body. Dr. Lineweaver testified that when skin is burned in this way, it will not grow back perfectly, but will result in scarring. Dr. Lineaweaver testified that it was his opinion that Tony's skin would never look the same, and that he would always have permanent scarring and skin discoloration. He also testified Tony would be sensitive to the elements and extreme temperatures. Dr. Lineaweaver stated that such burn wounds continue to heal for at least a year after injury. As a result of Tony's burns, Dr. Lineaweaver testified that it was "inadvisable" for Tony to work in jobs where he was exposed to sunlight or extreme temperatures. Although he did not see Tony again after January 12, 2011, he stated his opinion was based on "a reasonable interpretation of [his] examinations, plus the expectable course, plus whatever photographs [he] saw subsequently."

¶90. Dr. Brooks and EMA assert good cause existed for additional testing of Tony's skin sensitivities due to the passage of time since Dr. Lineaweaver's examination. But when asked about the additional testing sought by the defense in its IME motion, Dr. Lineaweaver testified that he had "never seen those tests, with which [he was] reasonably familiar in other contexts, applied to a burn patient." He was specifically asked about tests that could be done "[t]o determine sensitivity, thermal regulation, all sorts of things, sweat gland production." Dr. Lineaweaver responded:

> [I]n an area of injury that really extends through many parts of the body that has different levels of injury you know, clearly some of his skin returned to

31

relatively normal color and everything else, others didn't—it would be very hard to standardize a test like that. So pretty much clinical examination and functional interpretation of what the patient is saying would be the realistic way to assess whatever's going on in terms of sweat, skin dryness and so on like that.

¶91. In addition to Dr. Lineaweaver's testimony, Tony himself testified as to the continued effects of the burns, stating that he cannot be exposed to water that is too hot or too cold because of his painful skin sensitivity. He testified he has trouble regulating his body temperature and has to layer on and off clothing to keep a normal temperature. As far as his skin's appearance—whether it was getting better or worse or staying the same—Tony testified that over the past year, his skin had stayed the same. Monique Ealy, director of children services at Stewpot Ministries, where Tony volunteered, testified that after Tony was burned, he had to shield himself from the sun by wearing a towel on his head, long socks, and long-sleeve shirts. As far as physical evidence of permanent or long-term scarring, during trial in December 2012, which was held two years after Tony was burned, Tony removed his shirt for the jury to view his injuries. Thus, the jury heard Tony's testimony and could view for itself the extent of the injuries two years after they occurred.

¶92. "The specific requirement of good cause would be meaningless if good cause could be sufficiently established by merely showing that the desired materials are relevant, for the relevancy standard has already been imposed by Rule 26(b)." *Schlagenhauf*, 379 U.S. at 118. Rule 35's inclusion of the words "good cause" "indicate[s] that there must be greater showing of need under Rules 34 and 35 than under the other discovery rules." *Schlagenhauf*, 379 U.S. at 118. "'Good cause' requires a showing that the examination could adduce

specific facts relevant to the cause of action and necessary to the defendant's case." *Ornelas v. S. Tire Mart LLC*, 292 F.R.D. 388, 391 (S.D. Tex. 2013). "The ability of the movant to obtain the desired information by other means is also relevant." *Schlagenhauf*, 379 U.S. at 118. While the rules of civil procedure "should be liberally construed, . . . they should not be expanded by disregarding plainly expressed limitations." *Id.* at 121.

¶93. I find that there was an abundance of available evidence as to Tony's medical improvement that was presented through the medical records and the testimonies of multiple physicians and others, including Tony and his mother—all of whom were available to the defense prior to trial. Five treating doctors were available: Dr. Lineaweaver, Dr. Brooks, Dr. Hudson, Dr. Dillard, and Dr. Paduda. Dr. Brooks and EMA also called their own expert, Dr. Chemene Quinn, a board-certified dermatologist. Dr. Quinn testified on behalf of the defense that cantharidin is used to treat molluscum "because it doesn't cause as much scarring as other therapies. It doesn't cause scars. . . . It doesn't go deep enough." Dr. Quinn testified that cantharidin only affects the epidermis and that "by definition it doesn't cause scarring," only blistering. From viewing Tony's body, she testified she saw no scarring, but rather pigmentary changes, or discoloration of the skin, which can heal over time. She also testified she could not "find anything scientific" to support Tony's sensitivities to heat, cold, and sunlight. Based on the abundance of evidence presented from both sides, I find Dr. Brooks and EMA have failed to specify in their motion what additional information could be garnered from the IME that was not already available.

¶94. I also note that Dr. Brooks and EMA have not cited a single comparable case in

33

support of their Rule 35 argument. Not one case is cited where an IME was granted in light of the abundance of medical testimony available in this case. The majority cites two cases where IMEs were granted: *Ragge v. MCA/Universal Studios*, 165 F.R.D. 605 (C.D. Cal. 1995), and *Galieti v. State Farm Mutual Automobile Insurance Co.*, 154 F.R.D. 262 (D. Colo. 1994). In *Ragge*, the defense requested a mental examination of the plaintiff after she filed a sexual-harassment and discrimination suit. *Ragge*, 165 F.R.D. at 608-09. In *Galieti*, an IME was requested to evaluate whether the plaintiff suffered emotional distress from an allegedly unlawful termination. *Galieti*, 154 F.R.D. at 262. Neither case involved an abundance of readily available medical testimony.

¶95. There is a lack of caselaw in Mississippi dealing with Rule 35; however, the most recent supreme court decision involving Rule 35 also does not support Dr. Brooks and EMA's assertion that the trial court abused its discretion in denying the request for an IME. In *Baker Donelson*, 42 So. 3d at 481 (¶20), an IME was requested to garner information on the plaintiff's mental and psychological injuries that were the basis of an intentional-infliction-of-emotional-distress claim. The trial court found the defense failed to show good cause for the examination and that the "defendants offered no evidence that the depositions of [the plaintiff] and his treating physician and the production of [the plaintiff's] medical records [were] inadequate or insufficient to show [the plaintiff's] physical and mental status." *Id.* at 495 (¶63). The supreme court noted that the matter was one of first impression. *Id.* While citing the limited nature of the record, the supreme court nonetheless found no abuse of discretion in the trial court's finding. *Id.*

34

¶96.   Dr. Brooks and EMA have failed to show the available depositions and medical records were inadequate or insufficient to present the jury with evidence of Tony's long-term injuries.  This is not a case where the plaintiff's injuries are disputed.  Dr. Brooks openly admitted his negligence, and that his negligence resulted in Tony's injuries.  Dr. Brooks admitted the following in his deposition:

Q.     Do you take any responsibility for yourself, Dr. Brooks[,] for Anthony's injuries, not just for the prescription but for Anthony's injuries?

A.     Yes.

During trial, Dr. Brooks's counsel, in the presence of the jury, stated to Tony during his cross-examination, "Tony, I don't have a lot of questions for you.  I don't dispute that you were injured at all, and I'm sorry you were injured."

¶97.   Dr. Brooks and EMA have failed to show an IME of Tony was necessary.  Thus, I find the trial court did not abuse its discretion in finding lack of good cause for an IME.

### B.     Failure to Comply with the Form Required by Rule 35

¶98.   In addition lacking good cause, Dr. Brooks and EMA's motion for an IME failed to comply with the specificity requirements of Rule 35.  Rule 35 requires the motion to include the "time, place, manner, conditions, and scope of the examination and the person or person by whom it is to be made."  The burden is on the movant to "produce sufficient information, by whatever means, so that the [trial] judge can fulfill his function mandated by the Rule"—that is, a determination of whether the motion meets Rule 35's requirements of "in controversy" and "good cause."  *Schlagenhauf*, 379 U.S. at 121.  "Parties seeking a

court-ordered mental or physical examination should . . . provide the necessary details to the court, or they otherwise risk denial of their motions solely on the grounds that the court cannot comply with this provision of the Rule." *Ornelas*, 292 F.R.D. at 398. The "[p]laintiff is . . . entitled to a certain degree of direction regarding those examinations, thereby providing him the opportunity to bring to the [c]ourt's attention those tests he deems irrelevant or harmful." *Id.*

¶99. Dr. Brooks and EMA's IME motion simply requests an IME of Tony "to be performed by a dermatologist selected by the party seeking the examination, at a time and place to be agreed upon by the parties." There is no information in the motion upon which the plaintiff could lodge an objection. Further, not only does the motion fail to include a proposed doctor to conduct the examination, the motion specifies the doctor will be selected by Dr. Brooks and EMA, which is contrary to the suggestion of an "independent" medical examination.

¶100. Citing Federal Rule of Civil Procedure 35, upon which Mississippi's rule is based, other jurisdictions have noted that "[n]o absolute right to the choice of a doctor is expressed in Rule 35." *Stuart v. Burford*, 42 F.R.D. 591, 592 (N.D. Okla. 1967). "[W]hen no serious objection arises, it is probably best to appoint the doctor of the moving party's choice." *Chaney v. Venture Transport Inc.*, No. Civ.A. 03-2886, 2004 WL 445134, at *1 (E.D. La. 2004) (citing 8A Wright, Miller & Marcus, *Federal Practice and Procedure* § 2234.2 (2d ed. 1994)). However, where "the plaintiff has made strenuous objection to defendant's choice of physician[,] . . . it is best that another physician be appointed. If the parties can select a physician mutually agreeable, his name may be submitted. If not the [c]ourt will

make its own choice." *The Italia*, 27 F. Supp. 785, 787 (E.D.N.Y. 1939). The plaintiffs had no opportunity to object to the choice of physician, as the defense failed to name one.

¶101. Given the lack of good cause and the failure to comply with Rule 35's requirements, the trial judge determined the IME motion should be denied. There is nothing to indicate he abused his discretion in doing so.

C. *The Trial Court's Failure to Promptly Rule on the IME Motion*

¶102. I also do not find the trial court erred in delaying its ruling on the motion for an IME. Dr. Brooks and EMA filed their IME motion on March 26, 2012. A hearing was held on April 19, 2012, at which time the trial court took the matter under advisement. The trial court then denied the motion on November 30, 2012. On December 6, 2012, Dr. Brooks and EMA filed a renewed motion for an IME based on their recent deposition of Dr. Lineaweaver. The renewed motion was denied on December 10, 2012, just prior to the beginning of trial.

¶103. The burden is on the movant to take action on pending motions. *Busby v. Anderson*, 978 So. 2d 637, 639 (¶11) (Miss. 2008) (The movant has "a duty to diligently pursue [its] claim," such as by following up on pending motions or by filing a mandamus petition.). I find Dr. Brooks and EMA cannot now complain of the trial court's failure to rule promptly, as Dr. Brooks and EMA failed to pursue their motion. Rather, I find the trial court's failure to address the issue is tantamount to a denial. I cannot find the trial court erred in not ruling on the motion in a more timely manner.

II. *Admissibility of Dr. Lineaweaver's Expert Testimony on Permanent*

37

*Impairment*

¶104. The majority next finds that the trial court erred in admitting Dr. Lineaweaver's expert testimony on Tony's permanent injuries. The majority finds the testimony was unreliable because Dr. Lineaweaver did not examine Tony after January 12, 2011, and did not review any medical records past May 11, 2011.

¶105. In determining whether expert testimony is admissible as provided in Mississippi Rule of Evidence 702, we look to whether the testimony is relevant and reliable. *Hale v. State Democratic Exec. Comm.*, 168 So. 3d 946, 955 (¶29) (Miss. 2015) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 38 (¶16) (Miss. 2003)). "The admission of expert testimony is within the sound discretion of the trial judge." *Id.* We "will not reverse a trial court's decision to exclude expert testimony unless it finds that the trial court's decision was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Id.*

¶106. There is no dispute that Dr. Lineaweaver was eminently qualified to testify at trial. He obtained his medical license in 1976 and served as the chief of plastic surgery at the University of Mississippi Medical Center from 2003-2007. At the time of trial, he was the head of Mississippi's only burn center, the JMS Burn & Reconstructive Center, where he treated Tony. He testified that since starting the JMS Burn Center in 2009, he had treated well over a thousand burn patients. Because Dr. Lineaweaver testified through video deposition, the trial court directed the parties to make objections during the videotaping, and the trial court would later rule on the objections. Based on the trial court's rulings on the various objections, the video was edited to exclude any inadmissible testimony.

38

¶107.  Dr. Lineaweaver admitted that he was not familiar specifically with cantharidin burns, apparently because this medication is rarely, if ever, used in his practice and that he had seen no patients who had presented themselves to the burn center with this type of burns. However, Dr. Lineaweaver testified he was very familiar with the type of injury that resulted from the misuse of the medication—second-degree chemical burns.  Tony was diagnosed at UMMC with chemical burns, and Dr. Lineaweaver's diagnosis was consistent with UMMC's diagnosis.  Dr. Lineaweaver testified about the second-degree burns and gave his opinion on their long-term effects.  There is no per se rule excluding Dr. Lineaweaver's testimony because he had no prior experience with cantharidin, especially considering his familiarity with the resulting burn injuries.

¶108.  Dr. Lineaweaver gave his opinion of the long-term effects of Tony's injuries based on the information available to him and his experience with thousands of burn patients.  He made this very clear in his testimony.  For example, when asked if Tony is now more sensitive to sun exposure, he answered, "Based on the available information, I would say he is."  He stated that the available information included "[his] examinations, the understanding of [Tony's] original injury, and the most recent credible photographs that [he] saw[.]"  The photographs he viewed were dated January 2011 through June 2012.  He testified that over that eighteen-month time period, the pictures "certainly show the same hypopigmentation areas that are seen in all the other pictures.  They don't seem to have changed.  Those areas, in my opinion, would be sun sensitive."

¶109.  The notes from Tony's December 22, 2010 examination with Dr. Lineaweaver reflect

that Tony had a "scar condition" and "fibrosis of skin," and was instructed to apply moisturizing lotion liberally several times a day and to avoid sun exposure. Dr. Lineweaver explained this assessment and treatment plan as follows:

> A.  Many second[-]degree burns do not have a return to normal skin. They have residual areas of, in effect, fibrosis, skin areas or appendages that have been replaced by scar. So . . . [management] include[s] skin care with moisturizing lotion because regenerated—or tissue like the fibrotic skin tissue may have fewer sweat gland[s], can become dry and easily irritated. Sun exposure can easily proceed to a much more damaging level in fibrotic skin because, ultimately, the layers of the skin are shallower than normal. So blistering can be more severe. Secondary scarring from sunburn can be more likely. And generally, sun exposure is not well tolerated by somebody who's had a second degree burn with some residual replacement of normal skin by scar tissue.

> Q.  And in Anthony's case, is that what you found?

> A.  Yes.

¶110. Testimony is reliable if it is "grounded in the methods and procedures of science, [and] not merely a subjective belief or unsupported speculation." *Worthy v. McNair*, 37 So. 3d 609, 615 (¶16) (Miss. 2010). Dr. Lineaweaver's testimony was not a subjective belief or unsupported speculation. It was based on the information before him and his experiences with thousands of burn patients. Further, Dr. Lineaweaver's testimony was subject to extensive cross-examination, where the defense was free to emphasize that Dr. Lineaweaver had not personally examined Tony since January 12, 2011. Dr. Lineaweaver admitted he did not know Tony's final point of healing. Regardless, the jury heard testimony from Tony himself regarding the long-term effects of his injuries and physically saw Tony's body when he removed his shirt at trial.

¶111. Dr. Lineaweaver's testimony regarding his opinion of Tony's permanent or long-term injuries was properly admitted as relevant and reliable. Any questions regarding the credibility or weight given to his testimony were subject to determination by the jury. *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 747 (¶25) (Miss. 2008). Because the evidence shows that Dr. Lineaweaver's testimony on Tony's permanent injuries was relevant and reliable, I find no abuse of discretion by the trial judge in admitting his testimony. I would affirm on this issue.

III. *Economic-Damages Verdict*

¶112. The jury awarded Tony $1,500,000 in economic damages. Dr. Brooks and EMA argue, and the majority finds, that this amount was not supported by the credible evidence.

¶113. Dr. Glenda Glover[5] testified at trial regarding Tony's future lost wages. She testified that based on his permanent injuries, his lost wages were approximately $707,686 with no college degree and up to $2.5 million with a college degree. Tony's undisputed medical expenses were $112,499. The majority takes issue with the fact that Dr. Glover's testimony was based in part on Bruce Bawner's jobs analysis, which was based in part on Dr. Lineaweaver's testimony regarding Tony's permanent injuries. Based on its finding that Dr. Lineaweaver's testimony on permanent injuries was unreliable, the majority likewise finds Dr. Glover's testimony on lost wages unreliable. Consequently, the majority finds the economic-damages verdict is improper to the extent it exceeded the undisputed amount of $112,499.

---

[5] Dr. Glover is not related to the Appellee or her minor son.

¶114. As I find Dr. Lineaweaver's testimony was properly admitted, I also find the jury's economic-damages verdict should be affirmed. "The amount of damages is a question for the jury." *Downs v. Ackerman*, 115 So. 3d 785, 790 (¶16) (Miss. 2013). A jury award generally will not be "set aside unless so unreasonable as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous." *Id*. Dr. Brooks admitted his negligence resulted in Tony being chemically burned. The jury heard and saw that Tony was scarred. The jury also heard that he was temperature sensitive and had lost access to certain jobs. The testimony showed Tony's estimated future lost wages plus medical expenses fell between $820,185 and $2,612,499. The economic-damages award of $1,500,000 was not unreasonable considering the evidence presented. I would affirm on this issue.

## IV. Superseding-Cause Jury Instruction

¶115. Finally, the majority finds that the trial court erroneously denied Dr. Brooks and EMA's request for superceding-cause jury instruction D-10. It states in part:

> [I]f you find from a preponderance of the evidence that Dr. Brooks was negligent, but that an independent and unforeseeable negligent act by Marty's Pharmacy in failing to direct, instruct, counsel or otherwise exercise reasonable care in compounding and dispensing cantharidin to the Glovers came after Dr. Brooks'[s] acts and was a substantial factor in causing Anthony Glover's injuries, if any, then John Brooks, M.D. and Emergency Medicine Associates of Jackson, PLLC are not liable for any injuries proximately resulting from the superseding cause, and your verdict shall be in favor of John Brooks, M.D. and Emergency Medicine Associates of Jackson, PLLC.

¶116. I find this proposed instruction was correctly refused for two reasons. First, it does not instruct the jury on Mississippi's comparative-negligence law. Mississippi is a pure

42

comparative-negligence state. *Burton v. Barnett*, 615 So. 2d 580, 582 (Miss. 1993). "Under the comparative negligence doctrine, negligence is measured in terms of percentage, and any damages allowed shall be diminished in proportion to [the] amount of negligence attributable to the person for whose injury, damage[,] or death recovery is sought." *Id.* The proposed instruction states that the jury must find in favor of Dr. Brooks and EMA if Marty's Pharmacy's actions substantially caused Tony's injuries. This is not an accurate statement of the law, as the jury could find and attribute fault to each party. Second, Dr. Brooks's theory of defense—that Marty's Pharmacy's actions were the proximate cause of Tony's injury—was fairly covered in the given jury instructions. The given instructions permitted the jury to find the pharmacy entirely liable for Tony's injuries, if that is how it chose to attribute fault. We will not find error in the refusal of a jury instruction if "the [given] instructions, taken as a whole, . . . fairly present the applicable law." *Young v. Guild*, 7 So. 3d 251, 259 (¶24) (Miss. 2009). "[I]f other instructions [that are given] adequately instruct the jury, a party may not complain of a refused instruction on appeal." *Id.*

¶117. Because instruction D-10 does not accurately reflect Mississippi's comparative-negligence law, and because Dr. Brooks and EMA's theory of defense was covered elsewhere in the given instructions, I cannot find the trial court erred in refusing proposed instruction D-10.

¶118. For the reasons stated, I dissent. I find no reversible error and would affirm the jury's verdict.

    **LEE, C.J., JOINS THIS OPINION.**

43