# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00631-COA

**MARK ALLEN WILLIAMS A/K/A MARK A. WILLIAMS A/K/A MARK WILLIAMS**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/16/2018 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS-BLACKMON |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES H. POWELL III |
| | RICHARD T. STARRETT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| | JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | AKILLIE MALONE OLIVER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 02/25/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**TINDELL, J., FOR THE COURT:**

¶1.    A Yazoo County grand jury indicted Mark Williams for two counts of simple assault against a law-enforcement officer.  A jury convicted Williams of Count I but found him not guilty of Count II.  The Yazoo County Circuit Court fined Williams $500 and sentenced him to five years in the custody of the Mississippi Department of Corrections (MDOC), with three years to serve, two years suspended, and two years of supervised probation.  On appeal, Williams raises the following issues: (1) he was denied his constitutional and statutory rights

to a speedy trial; (2) the circuit court erroneously excluded the testimony of his treating psychiatrist Dr. Sudhakar Madakasira; (3) the State committed prosecutorial misconduct; (4) the circuit court erred by admitting into evidence his pretrial statement to law enforcement; (5) the circuit court erroneously refused his jury instruction on the right to defend against an unlawful arrest; and (6) cumulative error entitles him to a new trial.

¶2.    Upon review, we find that it was error to exclude Dr. Madakasira's expert testimony and that, coupled with the acts of prosecutorial misconduct contained in the record, these issues constitute reversible error.  We therefore reverse Williams's conviction and sentence and remand this case to the circuit court for a new trial on the merits.  Even though we find reversible error on these grounds, we must also address Williams's speedy-trial arguments. *See Newell v. State*, 175 So. 3d 1260, 1267-68 (¶5) (Miss. 2015).  In so doing, we find that Williams waived his statutory right to a speedy trial and that his constitutional claim to a speedy trial lacks merit.  After considering Williams's remaining claims, we find they also lack merit.  We therefore decline to further address those assignments of error on appeal.

**FACTS**

¶3.    At the time of his arrest on April 19, 2014, Williams worked as a supervisor at a chemical plant, where he had been employed for thirty-two years.  Williams and his wife Douglas had been married for thirty-three years, and during their marriage, they had two daughters, Lauren and Kristen.  At Williams's trial, Douglas testified that she began to notice after the first year of marriage that Williams would go into rages for no apparent reason. Douglas stated that Kristen had also experienced her own terrible rages before her suicide

2

in 2003. According to Douglas, she "lost" Williams as soon as they buried Kristen. Douglas testified that Williams "ended up being unable to stop crying night[ and] day. He couldn't . . . move." Williams eventually sought treatment from a psychiatrist and was admitted for inpatient treatment at Saint Dominic's behavioral health center for about two weeks. Douglas testified that Williams then went to outpatient care at Psycamore, a psychiatric treatment facility, where he received treatment all day every weekday for about three months. After Williams's release from Psycamore, Douglas testified that he was calmer for about six months.

¶4. The week before Williams's arrest on Saturday, April 19, 2014, Douglas testified that Williams seemed angry about something but that he would not discuss the issue with her or their daughter, Lauren. Douglas recalled advising Lauren that something was wrong with Williams and that Lauren should stay out of his way. That Thursday evening, Williams drove to Best Buy to return an item. Douglas testified that Williams was angry when he left the house. When Williams returned home, he told Douglas that he had hit a pole in front of Best Buy with his truck. Douglas looked outside and observed a dent in the side of Williams's truck. When Douglas questioned Williams the next morning about what had happened at Best Buy, Williams appeared to have no recollection of the previous night's events. Douglas testified that Williams usually either did not recollect or would have trouble remembering what had occurred during his rage episodes.

¶5. When Williams returned home from work that Friday evening, Douglas testified that he once again became angry. Douglas testified that Williams hit her in the face and threw

3

Lauren against the kitchen counter. Until that Friday evening, Douglas stated that Williams had never before hit her or ever come close to hitting her. When Lauren asked why Williams was acting so crazy, Williams responded, "I will show y'all crazy." Williams then walked toward the bedroom. Afraid that Williams was headed for his gun case, Douglas and Lauren got into their cars and tried to leave. When they reached the gate at the end of their driveway, they found Williams's truck blocking their way. As Lauren moved Williams's truck, Douglas testified that they heard a gunshot from the direction of the house. Although they feared that Williams might have shot himself, Douglas and Lauren drove to the home of Douglas's sister, Lelouise Davis, for help.

¶6. Douglas and Lauren shared with Lelouise their fear that Williams had shot himself. Lelouise, a nurse practitioner, returned to the Williamses' house with Douglas and Lauren, but the women saw no signs of Williams in the yard. Lelouise testified that she entered the home first and found Williams sitting in his underwear. Lelouise further testified that Williams was normally "a modest individual" and that "for him to sit in front of me in underwear with no clothes was very unusual." When Lelouise asked Williams what was going on, Williams did not appear to know what she meant. Williams simply sat in his chair staring at the wall with his gun leaning nearby. Williams eventually stood up, got dressed, and left the house. Douglas testified that she and Lauren barricaded themselves inside Lauren's bedroom for the night and that they did not see Williams again until the next day.

¶7. The following morning, on Saturday, April 19, 2014, Douglas drove to her in-laws' home to check on her sick mother-in-law. Douglas asked Tonya Cresswell, a friend and

4

neighbor, to be on standby in case anything happened while Douglas was gone. Douglas later called Tonya back and asked if Tonya would drive to the Williamses' house to check on Lauren. Tonya testified that a hysterical Lauren met her when she arrived at the Williamses' house and that Lauren stated her father was "going crazy." Tonya looked outside and observed Williams speeding around the yard in his truck. Tonya testified that Williams kept "going from one place to another outside and getting in his truck and getting out of his truck." Tonya also characterized Williams's behavior as "crazy" and testified that she could not tell what he was trying to do.

¶8. Douglas testified that she arrived home around 1:30 p.m. that Saturday after Lauren called her and stated that Williams was again acting crazy. In addition to Tonya, Douglas had asked her sister and her brother-in-law, Francis and Chuck Dawkins, to come help her with Williams. Francis confirmed during her testimony that Douglas had asked her and Chuck to come over because Williams had gone crazy. When the Dawkinses arrived at the Williamses' house, Francis testified that she "watched . . . [Williams] drive crazy around the yard. And he flew through the pasture and up the driveway across the actual part of the yard over to the side of the house. He was just driving like a maniac."

¶9. At Francis's urging, Chuck got into Williams's truck. Williams and Chuck drove over to where Williams had ripped up about thirty or forty feet of fencing, and Chuck asked why Williams had torn down those sections of the fence. Williams responded that the men's father-in-law had told Williams to get his stuff off the father-in-law's land. Williams told Chuck that he was therefore moving his dog pen off the father-in-law's land. Williams

5

further claimed that the fence's gate had been too narrow to move the dog pen through so he had torn down some of the fencing to create a wider opening. Chuck testified, however, that the dog pen could have been transported through the fence's double gate without tearing down the sections of fence. Despite Williams's unusual behavior, Chuck began to help Williams move the pieces of the dog pen. While the men were working, Douglas came over and stated that her father had never told Williams that he had to move the dog pen. Chuck testified that he did not remember Williams give Douglas any type of response. Instead, Williams simply kept working to move the dog pen.

¶10. After the men moved the dog pen, Francis got into the truck to speak to Williams while Chuck stood by the porch. Francis testified that Williams was a great guy and had always been wonderful to her. Francis stated that she hoped to help Williams by speaking with him and urging him to seek treatment. Francis commented on the crazy way Williams was driving and acting, and she asked Williams what he was doing. Francis testified that in response to her comments and question, Williams got a "weird" look on his face and asked her what she meant. Francis stated that she again told Williams he was not acting normally and that they needed to get him some help. Francis testified that she was scared for Williams and felt as though the day in question was a "pretty critical" time for Williams. She stated that Williams told her that at 3 p.m. no one would have to worry about him anymore and that he would no longer be a problem. As she was urging Williams to seek treatment, Francis stated that deputies from the Yazoo County Sheriff's Department arrived. Francis testified that Williams drove so quickly across the lawn to where the deputies had parked that he

6

scared her. When Williams stopped his truck by the deputies, Chuck yelled for Francis to get out of the truck. Francis exited the truck and joined Chuck by the porch.

¶11. Douglas testified that she had called 911 to request assistance in dealing with her husband. Douglas stated that she told the 911 operator that Williams was pulling up the concrete fence posts that corralled her father's cattle and that he appeared to be going crazy. According to Douglas, she informed the operator that Williams had never been the same after Kristen's suicide, that Williams was sick, and that she needed help getting him somewhere for treatment. Douglas testified that Williams's actions during the week leading up to his arrest were not rational, and she stated that in her opinion, Williams did not know what he was doing on the day in question.

¶12. Deputy Loraine Hudson responded to Douglas's 911 call. According to Deputy Hudson, the dispatcher reported that the caller had claimed Williams was not taking his antidepressant medication and had been drinking. Upon arriving at the Williamses' house, Deputy Hudson testified that Douglas approached her and stated that Williams was taking street drugs and "had been on street drugs the whole weekend and that he had torn down . . . her father's fence." Deputy Michael Wilson, who also responded to the 911 call, similarly testified that Douglas told the deputies Williams was on drugs and had been drinking.

¶13. The deputies both testified that Williams drove up to the house after they arrived and that Deputy Wilson stated they wanted to speak with him. The deputies testified that Williams then cursed at them and drove away. With the deputies following him in their respective vehicles, Williams drove to a shed across the street from his house and parked his

7

truck. Testimony reflected that Deputy Wilson arrived at the shed next, followed by Deputy Hudson, and finally, by Chuck.

¶14.  Deputy Wilson testified that after he exited his vehicle, Williams charged toward him in a rage and eventually knocked him to the ground. Both deputies testified that Williams got on top of Deputy Wilson and began to fight with him. Deputy Wilson stated that Williams grabbed his (Deputy Wilson's) neck and tried to force his head toward the ground. As the two men rolled around on the ground, Deputy Wilson testified that they bit each other's hands. Deputy Hudson testified that Williams was on top of Deputy Wilson at one point and was "[j]ust pounding" Deputy Wilson. Deputy Hudson climbed on Williams's back to try to get him off Deputy Wilson, but Williams managed to throw her off his back. The deputies testified that Williams abruptly stopped fighting, got up, and headed in the direction of his shed.

¶15.  Chuck stated that he arrived at the shed as Williams and the deputies were getting up from the ground. Chuck, a retired state trooper, testified that he never witnessed Williams assault anyone. Both deputies testified that Deputy Wilson told Williams to stop walking toward his shed after the altercation but that Williams responded that the deputies would have to tase him. The deputies further stated that after Williams refused to stop walking toward his shed, Deputy Wilson tased him. Chuck testified, however, that he never heard either deputy order Williams to stop and that Deputy Wilson instead tased Williams in the back.

¶16.  After being tased, Williams fell to the ground. Chuck stated that he then identified

8

himself to the deputies and recommended that they restrain Williams before Williams regained consciousness. Deputy Wilson managed to place one handcuff on Williams before Williams recovered and stood back up.

¶17. Deputy Wilson testified that he backed away from Williams, and thinking that Williams was about to charge him again, he dropped his taser and drew his gun. The deputies and Chuck all testified that Williams told Deputy Wilson to shoot him and stated that Deputy Wilson did not have the "balls" to shoot him. Deputy Wilson testified that even though his gun was drawn, Williams steadily walked toward him with a smile on his face. The deputies testified that Chuck advised them not to shoot because Williams wanted to commit "suicide by cop." The deputies stated that Williams finally stopped approaching Deputy Wilson and allowed Deputy Hudson to place the other handcuff on him.

¶18. As a result of the altercation with Williams, Deputy Wilson suffered torn ligaments in his right shoulder that required surgery. Both deputies described Williams as being in a state of rage when they interacted with him, but they both stated that they had done nothing to enrage Williams or to cause him to curse at or charge them. Deputy Wilson testified that blood tests performed on Williams after his arrest showed no street drugs or alcohol in Williams's system. Although Deputy Wilson stated that he did not consider Williams's conduct at the time of the altercation to be normal, he further testified that he had encountered many suspects over the course of his career who displayed abnormal behavior during their interactions with law enforcement. Chuck testified, however, that on the day of the altercation Williams "was not the normal Mark" he had known for the past thirty-plus

9

years and that Williams "was not in his right mind." Chuck further stated that he had "never seen . . . [Williams] act like he acted that day" and that Williams had been "out of control."

¶19. Yazoo County Sheriff Jacob Sheriff arrived at Williams's home and transported Williams to jail. Sheriff testified that during the drive Williams voluntarily gave him an unprompted statement about the altercation. Sheriff stated that Williams apologized for the trouble he had caused the deputies and expressed regret that he had not stopped when the deputies commanded him to do so. Sheriff testified, however, that Williams was smiling and smirking as he made the statement.

¶20. Investigator William Gilmore interviewed Williams two days after the altercation occurred. After Williams waived his *Miranda*[1] rights, Investigator Gilmore took Williams's statement, which the State introduced into evidence. Williams told Investigator Gilmore that he had been disassembling a large dog pen when the two deputies arrived at his house. When Williams drove by the deputies, they asked to speak to him. Williams told the deputies that he did not have time to speak to them and that he had work to do. Williams stated that he then drove to his shed to get what he needed to repair his fence. The two deputies followed Williams to the shed and told him he was under arrest. Williams stated that he "was hot, tired, and irritated" by that point and that he cursed at the deputies even though he knew better. Williams also admitted to fighting with Deputy Wilson. Investigator Gilmore testified that Williams "was laughing the whole time he gave me the statement" and that Williams "thought it was funny."

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

10

¶21. Following his release from jail, Williams returned to Saint Dominic's behavioral health center for treatment. Douglas testified that Williams then returned to Psycamore for intensive outpatient treatment with Dr. Madakasira, whom Williams was still seeing at the time of trial. Douglas testified that Williams started to receive a monthly Abilify shot and that his rage episodes had stopped.

¶22. Four days prior to the August 28, 2017 trial, the State moved to exclude Dr. Madakasira's expert testimony about Williams's sanity at the time of the altercation. The State asserted that Dr. Madakasira's opinions failed to comply with the *M'Naghten*[2] test utilized in Mississippi criminal cases to prove insanity and that his opinions were therefore neither relevant nor reliable. Following a hearing on the State's motion, the circuit court concluded that Dr. Madakasira's testimony relied on an "inappropriate standard for determining whether a defendant was insane at the time of the crime." The circuit court therefore granted the State's motion to exclude Dr. Madakasira's testimony.

¶23. After the circuit court excluded Dr. Madakasira's testimony, Williams retained psychiatrist Dr. Mark Webb to examine and evaluate him. At trial, the circuit court accepted Dr. Webb as an expert in psychiatry. In addition to his court testimony, Dr. Webb provided a written report about his evaluation of Williams. The defense entered Dr. Webb's report into evidence. Based on his evaluation, Dr. Webb concluded to a reasonable degree of probability that at the time of the alleged crime, "Williams was psychotic[;] was in a bipolar manic state that was characterized by irrational thoughts, irrational behavior, inappropriate

---

[2] *M'Naghten's Case* (1843) 8 Eng. Rep. 718, 10 Clark & F. 200.

11

activities[;] and basically as a result of all of that[, Williams was] unable to understand and comprehend the quality of his actions . . . ." Dr. Webb further opined that Williams was unable at the time of the altercation to "know the difference between right and wrong."

¶24. On rebuttal, Dr. Criss Lott testified for the State. The circuit court accepted Dr. Lott as an expert in clinical forensic psychology. Upon the circuit court's order, Dr. Lott had evaluated Williams's "ability to stand trial, his mental state at the time of the alleged offenses, and other questions regarding his ability to waive his rights, and whether . . . his capacity to form his conduct was impaired at the time of the alleged offenses." Dr. Lott did not dispute that Williams had "a genuine mental illness" or that Williams had bipolar disorder. In addition, Dr. Lott agreed that on the day in question Williams "was very agitated" and "may [even] have been manic . . . ." Dr. Lott opined, however, that while Williams's mental disorder significantly impaired his judgment and behavior, Williams still clearly knew the nature and quality of his actions, the difference between right and wrong, and that his actions at the time of the altercation were wrong. Unlike Dr. Webb, Dr. Lott concluded that Williams failed to meet the criteria for legal insanity at the time in question.

¶25. After considering all the evidence and testimony, the jury found Williams guilty of Count I, simple assault against Deputy Wilson, but not guilty of Count II, simple assault against Deputy Hudson. The circuit court sentenced Williams to five years in MDOC's custody, with three years to serve, two years suspended, and two years of supervised probation. The circuit court fined Williams $500 and credited him for the five days he had already served in jail. In addition, the circuit court ordered Williams to undergo a mental-

12

health evaluation and treatment. Williams filed an unsuccessful motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. Aggrieved, Williams appeals.

## DISCUSSION

### I. Speedy Trial

#### a. Statutory Right

¶26. Williams alleges that his statutory right to a speedy trial was violated. Mississippi Code Annotated section 99-17-1 (Rev. 2015) provides that "[u]nless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned." As we have previously recognized, though, "if a defendant fails to raise the statutory right to a speedy trial within 270 days of his arraignment, he acquiesces to the delay." *Ford v. State*, 281 So. 3d 1109, 1114 (¶15) (Miss. Ct. App. 2019). The Mississippi Supreme Court has likewise held that "a defendant may effectively waive his right to complain of not being tried within the 270-day period set out in [section] 99-17-1[] when the defendant does not request or assert his right to a speedy trial or object to a delay, especially when the defendant fails to show any prejudice in the failure to be tried within the statutory 270-day period." *Guice v. State*, 952 So. 2d 129, 142 (¶28) (Miss. 2007).

¶27. Here, the 270-day period began to run on August 25, 2015, when Williams waived arraignment. Williams's trial did not start until April 9, 2018, which was clearly more than 270 days later. However, Williams also failed to raise his statutory right to a speedy trial until his appeal to this Court. We therefore find that Williams waived his statutory right to

13

be tried within 270 days of arraignment.

### b.    Constitutional Right

¶28.    Williams also asserts a violation of his constitutional right to a speedy trial.  For all criminal prosecutions, our federal and state constitutions provide that "the accused shall enjoy the right to a speedy and public trial . . . ."  U.S. Const. amend. VI; *accord* Miss. Const. art. 3, § 26.  To determine if a defendant's constitutional speedy-trial right has been violated, we consider the following four factors: "1) the length of delay, 2) the reason for the delay, 3) the defendant's assertion of his right to a speedy trial, and 4) prejudice to the defendant." *Ford*, 281 So. 3d at 1114 (¶17) (quoting *Collins v. State*, 232 So. 3d 739, 744 (¶18) (Miss. Ct. App. 2017)).  "[C]ourts must engage in a difficult and sensitive balancing process of the four factors because none of the factors is either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Id.*  Instead, the factors are related "and must be considered together with such other circumstances as may be relevant." *Id.*

### 1.    Length of Delay

¶29.    "The constitutional right to a speedy trial attaches at the time of a formal indictment or information or else the actual restraints imposed by arrest and holding to a criminal charge." *Collins*, 232 So. 3d at 745 (¶19) (internal quotation marks omitted).  Our supreme court "has previously held that a delay of eight months or more is presumptively prejudicial." *Id.*  Because the delay in Williams's case was well over eight months, this factor weighs against the State.

### 2.    Reasons for the Delay

14

¶30.    "Once the delay is deemed presumptively prejudicial, the burden shifts to the State to produce evidence justifying the delay and to persuade the trier of fact of the legitimacy of these reasons." *Id.* at (¶20).  We "must then determine whether the delay is attributable to the State or the defendant." *Id.*  In addition, we assign "different weights . . . to different reasons for delay." *Rowsey v. State*, 188 So. 3d 486, 495 (¶25) (Miss. 2015).  For instance, we weigh heavily against the State any delays the State intentionally causes "for the purpose of depriving a criminal defendant of his or her constitutional rights[,]" whereas we weigh less heavily against the State "[d]elays for good cause, [such as] a continuance for the purpose of finding a missing witness . . . ." *Id.*  By contrast, "continuances sought on behalf of the defendant toll the speedy[-]trial clock." *Id.*

¶31.    Between the time of Williams's arrest on April 19, 2014, and the start of his trial almost four years later on April 9, 2018, the State moved three times to continue the matter—once to allow Dr. Lott to conduct a mental evaluation of Williams and twice due to the unavailability of key witnesses.  The record reflects that Williams twice moved for his own continuances—the first time was due to the State's alleged delay in providing requested discovery, and the second time was due to Dr. Madakasira's unavailability on the scheduled trial date.  Because both parties filed their continuances for good cause, we find this factor to be neutral.

### 3.    Assertion of the Right to a Speedy Trial

¶32.    "The failure to assert the right to a speedy trial 'will make it difficult for a defendant to prove he was denied a speedy trial.'" *Collins*, 232 So. 3d at 745 (¶24) (quoting *Fisher v.*

15

*State*, 532 So. 2d 992, 996 (Miss. 1988)). As previously discussed, Williams's first mention of his right to a speedy trial occurred in his appellate brief. Accordingly, we find this factor weighs against Williams.

### 4. Prejudice

¶33. "To determine whether the delay resulted in actual prejudice[,] the Court considers three interests that the right to a speedy trial was meant to protect: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" *Ford*, 281 So. 3d at 1116 (¶25) (quoting *Collins*, 232 So. 3d at 746 (¶26)). Williams bears the burden to show actual prejudice "since the defendant is clearly in the best position to show prejudice under this factor." *Id.*

¶34. Williams was released on bond four days after his arrest. His argument therefore does not focus on the first consideration under the "prejudice" prong. As to the second interest regarding the accused's anxiety and concern, Williams merely states, without expounding or pointing to any supporting evidence, that his "anxiety and concern over the pending charges, over the four[-]year delay, was exacerbated by his severe mental disorder." The focus of Williams's argument instead appears to be the impairment his defense experienced due to the delay. Williams argues that the delays in proceeding to trial clearly prejudiced him because, had his trial occurred earlier, he would have had the benefit of Dr. Madakasira's testimony. Williams's argument assumes, however, that the State would not have moved to exclude Dr. Madakasira's testimony had the trial begun earlier. No evidentiary support for this assumption exists in the record. Because Williams has failed to show an actual prejudice

16

resulting from the delay in proceeding to trial, we must conclude that this factor weighs against Williams.

¶35. In summary, we find that the length of the delay weighs against the State while the reasons for the delay weigh in neither party's favor. But because Williams never raised the issue of a speedy trial before the circuit court and because he now fails to articulate any actual prejudice resulting from the delay, we find these factors weigh against Williams. In balancing these four factors, we conclude that no violation of Williams's constitutional right to a speedy trial occurred. We therefore find that this issue lacks merit.

## II. Expert Testimony

¶36. Williams argues the circuit court erred by excluding Dr. Madakasira's testimony about his lack of sanity at the time of the altercation. We review the admission or exclusion of evidence, including expert testimony, for abuse of discretion. *Emergency Med. Assocs. of Jackson PLLC v. Glover*, 189 So. 3d 1247, 1260 (¶60) (Miss. Ct. App. 2016). "Unless this Court concludes that a trial court's decision to admit or exclude evidence was arbitrary and clearly erroneous, that decision will stand." *Id.* (quoting *Watts v. Radiator Specialty Co.*, 990 So. 2d 143, 145-46 (¶7) (Miss. 2008)). We may only reverse "if the admission or exclusion of evidence results in prejudice and harm or adversely affects a substantial right of a party." *Chaupette v. State*, 136 So. 3d 1041, 1045 (¶7) (Miss. 2014).

¶37. On January 4, 2016, Williams filed a notice that he intended to present an insanity defense. In asserting insanity as a defense to his charges, Williams provided the State with Dr. Madakasira's November 23, 2015 letter in which Dr. Madakasira stated that Williams

17

suffered from previously undiagnosed and untreated bipolar disorder. Dr. Madakasira opined in his letter that Williams "was suffering from temporary insanity as part of [his] untreated bipolar condition on April 19, 2014[,] when he resisted and assaulted a police officer . . . ."

¶38. After receiving notice of Williams's intention to assert an insanity defense, the State filed no response claiming a defect in Dr. Madakasira's opinion. Instead, on March 18, 2016, the State moved to have Dr. Lott also examine Williams. The State further requested a continuance to allow time for the examination to take place. As an exhibit to its motion, the State attached Dr. Madakasira's November 23, 2015 letter. Following a hearing, the circuit court granted the State's motion for a mental evaluation. Dr. Lott examined Williams on August 31, 2016.

¶39. On December 7, 2016, the circuit court granted the State's ore tenus motion for a continuance based on Dr. Lott's unavailability on the date of trial. Without any objection from the defense, the circuit court rescheduled Williams's trial for April 3, 2017. In its order, the circuit court noted "that the Defense will be allowed to call Dr. Sudhakar Madakasira, MD, on April 4, 2017, even if it is necess[ary] for him to be called out of turn." On March 17, 2017, the State again moved for a continuance based on Deputy Hudson's unavailability for trial. Later that month, on March 29, 2017, Williams also requested a continuance based on Dr. Madakasira's unavailability. By order dated March 29, 2017, the circuit court granted Williams's motion for a continuance. The circuit court rescheduled Williams's trial for August 28, 2017, and again stated that the defense would be allowed to call Dr. Madakasira as a witness even if it was necessary to call him out of turn.

¶40. On August 24, 2017, four days before trial, the State filed motions in limine to exclude the testimony of three defense witnesses, including Dr. Madakasira's expert testimony about Williams's lack of sanity at the time of the crime. At the hearing on the State's motion, Dr. Madakasira testified to his credentials and experience in psychiatry. Dr. Madakasira then stated that he began treating Williams in May 2014, the month after the altercation with the deputies. On direct examination, Dr. Madakasira opined that Williams was unable on the day in question "to make a decision as to right or wrong in terms of what he was doing." Williams's attorney asked whether Dr. Madakasira's opinion as to Williams's inability to know right from wrong at the time of the altercation was to a reasonable psychiatric probability, and Dr. Madakasira responded, "Yes, I would say so." Williams's attorney then asked whether Dr. Madakasira's opinion remained the same to a reasonable psychiatric certainty, and Dr. Madakasira again answered, "Yes."

¶41. On cross-examination, the State asked Dr. Madakasira to clarify whether his opinion was based on Williams being "irrational" or "insane" at the time of the altercation. In response, Dr. Madakasira stated that he wished to correct something he had written in his November 23, 2015 letter. Dr. Madakasira explained that "[i]nsanity is a legal term" while "irrational thinking is a medical psychiatric term." Dr. Madakasira testified that he therefore wished to correct the statement in his letter to provide that Williams "was temporarily out of his mind, irrational thinking, with poor judgments and poor decision making" at the time of the altercation with the deputies.

¶42. On redirect, Williams's attorney asked the following:

19

If the defendant was acting from a mental disease that existed to such a high degree [so] as to overwhelm his reason, judgment, and conscience, then under our legal definition he would be unable to distinguish right from wrong. In your opinion, was he [(Williams)] acting from a mental disease . . . [that] he had to such a high degree [so] as to overwhelm his reason, judgment, and conscience, that he was unable under those circumstances under that definition to form an opinion as to right and wrong?

In response, Dr. Madakasira stated, "I would say that he did not know right from wrong."

¶43.    After considering the parties' arguments, the circuit court granted the State's motion to exclude Dr. Madakasira's expert testimony. By order filed October 24, 2017, the circuit court found that Dr. Madakasira's testimony failed to comply with the *M'Naghten* test applied by Mississippi courts and instead appeared to discuss diminished capacity, which Mississippi fails to recognize as a defense to a criminal charge. The circuit court stated that Dr. Madakasira relied "on impaired thinking, irrational thinking, and poor judgment" throughout his testimony and that such a standard was inappropriate "for determining whether a defendant was insane at the time of the crime." The circuit court therefore excluded Dr. Madakasira's testimony.

¶44.    As the circuit court correctly noted, Mississippi applies the *M'Naghten* test (rather than a diminished-capacity standard) in criminal cases to determine whether a defendant was legally insane at the time of the crime. *See Hearn v. State*, 3 So. 3d 722, 738 (¶46) (Miss. 2008). With regard to the applicable standard, the Mississippi Supreme Court has explained:

The *M'Naghten* test for determining insanity is whether the accused knew right from wrong at the time the act was committed. Specifically, the Court has held that [to] prove insanity under *M'Naghten*, it must be proven that, at the time of the act, the accused was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was

20

wrong.

*Ealey v. State*, 158 So. 3d 283, 293-94 (¶32) (Miss. 2015) (citations and internal quotation mark omitted).

¶45.     In *Ballard v. State*, 768 So. 2d 924, 925 (¶1) (Miss. Ct. App. 2000), the defendant, Steven Ballard, faced multiple charges of simple assault against a law-enforcement officer. Ballard asserted he was insane at the time the crime had occurred, and to support his claim, he provided the written report of Dr. Joe Edward Morris, the clinical psychologist who had evaluated him. *Id.* at 927 (¶8).  In his report, Dr. Morris diagnosed Ballard with "major depressive disorder with psychotic features[,]" and he opined that Ballard had experienced a "temporary psychotic state [that] sprung from his deep depression." *Id.*  "The State, on the ground[] of failure to disclose, objected to any opinion from Dr. Morris that Ballard could not distinguish right from wrong on the day of the incident."  *Id.* at (¶9).  During the defense's proffer, Dr. Morris opined that due to a psychotic state at the time of the incident, Ballard knew neither the nature and quality of his acts nor right from wrong. *Id.*  On cross-examination, the State questioned whether the language Dr. Morris used in his written report equaled that of the opinion he provided during the proffer. *Id.*  Dr. Morris responded "that it was not the same thing but that it inferred the same thing, [and] in the same breath[,] he went on to state that he and the prosecutor were in a semantical quandary and that his report used the terms 'psychotic behavior' and 'break from reality' as opposed to the legal terms to which the [c]ourt referred as used in the *M'Naghten* definition for insanity." *Id.*

¶46.     The circuit court in *Ballard* excluded Dr. Morris's expert testimony about Ballard's

21

insanity on the day in question. *Id.* at 928 (¶10). The circuit court found that Dr. Morris's report offered a clinical diagnosis but provided no opinions as to Ballard's ability to understand the nature of his actions and to know the difference between right and wrong at the time of the offenses. *Id.* In noting that an expert may not deviate from the contents of his report without providing supplemental discovery before trial, the circuit court's "ruling hinged on the fact that Dr. Morris himself stated in his . . . [proffer] that an 'inference' was necessary as a bridge from his report to his stated opinion." *Id.* On appeal, this Court reversed and remanded for a new trial. *Id.* at 929 (¶13). In so doing, we stated:

> Although it is evident that . . . [Dr. Morris's] report did not use the magic words for the *M'Naghten* test . . . [, the report] clearly notified to the State that it was Ballard's basis for his insanity defense.
>
> . . . .
>
> To deny the defendant his substantial right to a fair trial on the basis of a ruling which ultimately turned on a matter of semantics would indeed be an injustice. The inference upon which the [c]ourt based its ruling was not one of substance but of form.

*Id.* at 928 (¶¶11-12) (citation omitted).

¶47. Similar to our holding in *Ballard*, we find that Dr. Madakasira's report may not have used "the magic words for the *M'Naghten* test[,]" but his report still clearly notified the State that Dr. Madakasira's opinion formed the basis for Williams's assertion of the insanity defense. *See id.* As in *Ballard*, Dr. Madakasira and the State employed different terms when referring to the effects of Williams's mental condition on the day in question. However, a review of Dr. Madakasira's hearing testimony, especially his responses to the questions posed by Williams's attorney, shows that despite the difference in semantics, Dr.

22

Madakasira's expert opinion clearly comported with the *M'Naghten* test.

¶48. During the hearing, Dr. Madakasira testified that he wished to correct the statement contained in his November 23, 2015 letter to provide that Williams "was temporarily out of his mind, irrational thinking, with poor judgments and poor decision making" at the time of the altercation. As Dr. Madakasira further explained, however, "[i]nsanity is a legal term" while "irrational thinking is a medical psychiatric term." Although Dr. Madakasira used psychiatric rather than legal terms to describe Williams's condition and its effects on the day in question, he still testified that to a reasonable psychiatric certainty, Williams's condition prevented Williams from "mak[ing] a decision as to right or wrong in terms of what he was doing" at the time of the altercation. Dr. Madakasira reiterated this opinion at the end of his testimony when, in response to a question from Williams's attorney, he answered, "I would say that he [(Williams)] did not know right from wrong."

¶49. On appeal, Williams argues that the circuit court "took an unreasonably narrow view of Dr. Madakasira's testimony" in excluding the psychiatrist's testimony for failure to comply with the *M'Naghten* test. We agree. In accordance with *M'Naghten*, Dr. Madakasira clearly opined that at the time of the altercation with the deputies, Williams's mental disease prevented him from knowing that his actions were wrong. *See Ealey*, 158 So. 3d at 293-94 (¶32).

¶50. As stated, we only reverse a circuit court's exclusion of expert testimony when the exclusion adversely affects a party's substantial right. *Chaupette*, 136 So. 3d at 1045 (¶7). Our caselaw establishes that "every accused has a fundamental right to have . . . [his] theory

23

of the case presented to a jury . . . ." *Jones v. State*, 281 So. 3d 137, 144 (¶18) (Miss. Ct. App. 2019) (quoting *Chinn v. State*, 958 So. 2d 1223, 1225 (¶13) (Miss. 2007)). Here, Williams's theory of the case was that he was insane at the time of the altercation, and the circuit court's exclusion of Dr. Madakasira's testimony prevented Williams from fully presenting his theory of the case to the jury. As a result, we find that the circuit court erroneously excluded Dr. Madakasira's expert testimony.[3]

### III.    Prosecutorial Misconduct

¶51.    Williams also contends that throughout his trial, and particularly during Dr. Webb's cross-examination and during closing arguments, the State committed numerous acts of prosecutorial misconduct. In a prior case involving reversal for the same district attorney's acts of prosecutorial misconduct, this Court stated:

> Where prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice, reversal must follow. The standard of review which appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created. The purpose of a closing argument is to fairly sum up the evidence. Prosecutors are not allowed to employ tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury. The prosecutor may comment upon any facts introduced into evidence, and he may draw whatever deductions and inferences that seem proper to him from the facts. Counsel cannot, however, state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudices of men by injecting prejudices not contained in some source of the evidence.

---

[3] While a harmless-error analysis would normally be warranted due to the admission of Dr. Webb's testimony, we find that this error, in conjunction with the prosecutorial misconduct directed at Dr. Webb's testimony, as discussed in part III of this opinion, renders such an analysis unnecessary.

Under the cumulative-error doctrine, individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial. The caselaw of our state allows an accumulation of otherwise harmless error to result in reversal. Aggregate instances of prosecutorial misconduct can lead to reversal.

*White v. State*, 228 So. 3d 893, 904-05 (¶¶28-29) (Miss. Ct. App. 2017) (citations and internal quotation marks omitted).

¶52. Upon review, we find that the district attorney made improper and prejudicial comments throughout Williams's trial. "While the comments may not be reversible standing alone, the cumulative effect of the otherwise harmless errors warrants reversal." *Id.* at 905 (¶30). We therefore reverse and remand based on this ground as well.

### a. Comments During Dr. Webb's Cross-Examination

¶53. During voir dire, the potential jurors were asked whether they knew Dr. Webb. One woman, who was later empaneled as Juror 11, responded that she knew of Dr. Webb through her work as a paralegal. The woman explained that when dealing with workers' compensation cases, her law firm sometimes sent employees to Dr. Webb for a second opinion. In reference to Juror 11's voir dire statement, the district attorney questioned Dr. Webb as follows on cross-examination:

[D]uring our voir dire section, the question was raised regarding you. And it was stated . . . that you have a history in the profession that if you have a doctor that you want to say whatever it is that you want him to say, then you'll call Dr. Webb. Is that kind of true regarding your reputation in the community?

¶54. During the recess that followed Dr. Webb's testimony, Juror 11 informed the circuit judge that she did not make any such statement about Dr. Webb. After reviewing the

25

transcript, the circuit judge found that Juror 11 never made such a statement. Williams's attorney explained that he was having trouble hearing all the questioning due to the courtroom's acoustics and that he had not heard the district attorney's question to Dr. Webb. Williams's attorney further stated that if he had heard the question, he would have objected to it. Following the recess, the circuit court instructed the jury that in judging Dr. Webb's credibility, it must disregard the district attorney's question because no such voir dire statement had ever been made.

¶55. The district attorney also questioned Dr. Webb about research not in evidence that she had obtained by conducting an Internet search. With regard to her out-of-court research, the district attorney asked Dr. Webb the following:

> I did a little Googling myself, you know, regarding a couple of cases. And isn't it true that in over 95 percent of the cases that you testify in, that . . . [whoever] the person is . . . [who] hired you, that that's pretty much the opinion that you give based off the person . . . [who's] hired you? If . . . they hired you[,] then 95 percent of the cases that you've testified in, then that's pretty much your opinion?

¶56. Our caselaw holds that an attorney may not "state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence." *Wilson v. State*, 194 So. 3d 855, 864 (¶30) (Miss. 2016). Williams's attorney objected to the district attorney questioning Dr. Webb with out-of-court evidence, but the circuit court overruled the objection and stated that Dr. Webb could respond if he knew the answer.

¶57. While the district attorney's comments during Dr. Webb's cross-examination may not have been sufficient, standing alone, to reverse Williams's conviction and sentence, we find that, when combined with the remaining acts of prosecutorial misconduct discussed below,

26

they resulted in cumulative error that deprived Williams of a fundamentally fair trial. *See White*, 228 So. 3d at 905 (¶29).

### b. Closing-Argument Comment on Dr. Webb's Hiring Date

¶58. Prior to closing arguments, Williams's attorney moved to prohibit the State from arguing that the jury should consider during its deliberations the late date at which Williams retained Dr. Webb. Williams's attorney pointed out that Dr. Madakasira had been prepared from the outset to testify as to Williams's lack of sanity and that Dr. Webb was retained three months before trial only after the circuit court granted the State's motion to exclude Dr. Madakasira's testimony. Williams's attorney therefore argued that it would be improper and unfairly prejudicial to the defense for the State to assert that Williams had purposely waited until three months before trial to obtain an expert.

¶59. In denying the defense's motion, the circuit court noted that Williams's attorney raised no objection when the district attorney questioned Dr. Webb on cross-examination about the date on which Williams retained him. After the circuit court's denial of Williams's motion, the following occurred during the district attorney's closing argument:

DISTRICT ATTORNEY: Now, they had Dr. Webb[,] and Dr. Webb, you know, he had one opinion from Dr. Lott and four months prior to this trial–

DEFENSE ATTORNEY: Your Honor, we object for the same reason stated earlier.

THE COURT: Overruled.

DISTRICT ATTORNEY: Four months prior to the trial, that's when he came in and he told this court that he charged

> $5,000. And he was not appointed by the Court.
> He was hired by the Defendant. Dr. Lott was not
> hired by the victims, and he was not hired by me.
> The expert that came in to say that he wasn't
> insane was specifically hired by him.

¶60. On appeal, Williams contends the circuit court's reason for denying his motion in limine "was flawed because the Defendant's objection was not to establishing the date [Dr.] Webb had been hired but to unfairly using that date as a reason to disbelieve his [(Dr. Webb's)] opinion." Williams agrees that no valid objection existed to the district attorney asking the date on which Williams retained Dr. Webb. Williams argues, however, that "[t]he proper objection, and the one [that] defense counsel made, was to the State unfairly arguing that the jury should disbelieve Dr. Webb's testimony because he was not consulted until shortly before trial."

¶61. In *White*, the State moved pretrial to prevent the defendant from using social-media evidence to show that the victim was lying and that the alleged events never occurred. *White*, 228 So. 3d at 899-900 (¶13). The circuit court granted the State's motion and excluded both the social-media evidence and any references to such evidence. *Id.* at 908 (¶42). During closing arguments, however, the State focused heavily on the defense's failure to present motive evidence that showed the victim had a reason to lie about the allegations. *Id.* On appeal, this Court found that the State exploited the circuit court's pretrial ruling excluding the social-media evidence. *Id.* at (¶43). In so finding, we explained:

> It is improper for a prosecuting attorney to comment on evidence excluded by the court. Here, because the circuit court went to such lengths to exclude evidence even remotely connected to the social-media evidence, the defense was deprived of the ability to present evidence supporting the

28

defense's theory regarding . . . [the victim's] motive to fabricate the allegations. Both the district attorney and the assistant district attorney used the circuit court's exclusion of the evidence to argue that the defense did not provide evidence of . . . [the victim's] motive for fabrication because none existed. The exploitation of the court's pretrial ruling in this manner was misleading to the jury, prejudicial to the defendant, and improper under the findings of this Court.

*Id.* at (¶44) (citation omitted).

¶62.    In the present case, Williams filed a January 4, 2016 notice of his intent to assert an insanity defense. The record further reflects that by March 18, 2016, the State had received Dr. Madakasira's opinion that Williams was temporarily insane at the time of the assault. Despite having received ample notice of Williams's insanity defense and Dr. Madakasira's opinion, the State waited until August 24, 2017, four days before trial, to move to exclude Dr. Madakasira's testimony. By order filed October 24, 2017, the circuit court granted the State's motion and excluded Dr. Madakasira's testimony. Williams then retained Dr. Webb, who examined Williams on January 18, 2018. Williams's trial began a little less than three months later on April 9, 2018.

¶63.    Upon review, we agree with Williams that the district attorney's closing-argument comment about Dr. Webb's late date of hire was improper, misleading, and unfairly prejudiced the defense. After successfully moving to have Dr. Madakasira's testimony excluded, the district attorney then used the circuit court's pretrial ruling to assert that Williams waited until just a few months before trial to hire an expert who would support his theory of the case. As in *White*, we hold that "[t]he exploitation of the court's pretrial ruling in this manner was misleading to the jury, prejudicial to the defendant, and improper under

29

the findings of this Court." *Id.*

### c. Closing-Argument Comments that "Something Is Wrong with Our Justice System"

¶64. Multiple times during her closing argument, the district attorney told the jury that something was wrong with the justice system if a defendant such as Williams could be allowed to assert an insanity defense. The district attorney's comments included the following:

> [W]hen I think about this case[,] something is wrong with our justice system where we can have a case where there's undisputed evidence that someone committed a crime, undisputed. They didn't call not one witness and say that these officers were not assaulted. Not one. Something is wrong if that's okay. And then they come in and say well he was insane–
>
> . . . .
>
> Something is wrong [when] a person is able to do all of this, say all of this, clearly he understands[,] and then he comes in and says, well, I didn't understand what was going on. I was insane. Really. No, no, no, no. That's not right.
>
> . . . .
>
> [Y]ou can't treat our law enforcement like this and then admit that you did it and then come in and say, I was insane. I didn't know what was going on. You're not allowed to do that.
>
> . . . .
>
> Something is wrong if you got this in writing with the man who's written it himself, and he's still coming in here saying he's insane and telling you that.
>
> . . . .
>
> Something is wrong when a man tells you he did it and apologizes for doing it and then you still say not guilty. Go home. Something is wrong with our system when that happens.

¶65. In conjunction with the other instances of misconduct discussed in this assignment of error, we find that the district attorney's improper closing-argument comments on Williams's right to assert an insanity defense endangered the fairness and impartiality of his trial.

## CONCLUSION

¶66. Because we find that the circuit court erroneously excluded the testimony of Williams's treating psychiatrist and that the State committed prosecutorial misconduct, we reverse Williams's conviction and sentence and remand this case to the circuit court for a new trial. In considering Williams's remaining claims on appeal, we find that his failure to timely assert his statutory right to a speedy trial waived the claim and that no violation of his constitutional right to a speedy trial occurred. Because we find that Williams's other claims lack merit, we decline to further address those arguments on appeal.

¶67. **REVERSED AND REMANDED.**

    **J. WILSON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. BARNES, C.J., AND McDONALD, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

    **CARLTON, P.J., DISSENTING**

¶68. I dissent because I find that the circuit court did not abuse its discretion in excluding Dr. Madakasira's expert testimony, an expert who Williams had retained to opine about his mental state with respect to his insanity defense. As recognized by the majority, the applicable standard of review regarding the exclusion of testimony, including expert testimony, is as follows:

    A trial court's admission of testimony is reviewed for an abuse of discretion.

31

We give great deference to the discretion of the trial judge, and unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, the trial judge's decision will stand. Moreover, we may reverse a case only if the admission or exclusion of evidence results in prejudice and harm or adversely affects a substantial right of a party.

*Chaupette*, 136 So. 3d at 1045 (¶7) (citations and internal quotation marks omitted). I do not find that the circuit court abused its discretion by excluding Dr. Madakasira's expert testimony because the circuit court's decision on this issue did not "prejudice and harm or adversely affect" a "substantial right" belonging to Williams. *Id*.

¶69. As the majority recognizes, after the circuit court excluded Dr. Madakasira's expert testimony, Williams retained Dr. Webb, a psychiatrist, to examine and evaluate him. Dr. Webb was accepted as an expert in psychiatry at trial, and he testified about Williams's mental state at the time of the alleged crime and Williams's ability to tell right from wrong, as follows:

[Defense counsel:] Based upon your interview or your evaluation of Mr. Williams and those records and circumstances of this incident, were you able to reach or come to a conclusion or an opinion to a reasonable degree of psychological probability of what the mental state would have been of Mr. Williams at the time of these crimes that he's alleged to have committed?

[Dr. Webb:] I did.

[Defense counsel:] Okay. And, Doctor, could you tell us what opinion that was?

[Dr. Webb:] That at the time of the alleged crime that Mr. Williams was psychotic, was in a bipolar manic state that was characterized by irrational thoughts, irrational behavior, inappropriate activities, and basically as a result of all of that unable to understand and comprehend the quality of

32

> his actions and know the quality of his actions. And also know the difference between right and wrong.

Dr. Webb also prepared a written evaluation of Williams, and this report was admitted into evidence. As the majority details above, based on his evaluation, Dr. Webb concluded to a reasonable degree of probability that at the time of the alleged crime, "Williams was psychotic[;] was in a bipolar manic state that was characterized by irrational thoughts, irrational behavior, inappropriate activities[;] and basically as a result of all of that[, Williams was] unable to understand and comprehend the quality of his actions . . . ." Dr. Webb further opined in his report that Williams was unable at the time of the altercation to "know the difference between right and wrong."

¶70. In short, Williams was allowed to present Dr. Webb's expert testimony and his expert report that supported Williams's insanity defense. As such, Williams was not prejudiced, nor did the circuit court affect a substantial right of Williams when it excluded Dr. Madakasira's expert testimony. Based upon the applicable standard of review, I therefore find that reversal of the circuit court's decision on this issue is not warranted, and I find that the alleged prosecutorial misconduct addressed by the majority does not constitute a sufficient basis, standing alone, to warrant reversal in this case. Because I find that Williams's other claims likewise lack merit, I would affirm Williams's conviction and sentence.